William F. BUCKLEY, Jr., Plaintiff,

v.

Franklin H. LITTELL, Defendant.

No. 70 Civ. 2844.

United States District Court,
S. D. New York.

May 23, 1975.

J. Daniel Mahoney, Windels & Marx, New York City, David P. Callahan, Wormser, Kiely, Alessandroni & McCann, New York City, C. Dickerman Williams, Baker, Nelson & Williams, New York City, for plaintiff.

David Blasband, Stanley H. Schneider, Linden & Deutsch, New York City, for defendant.

Dr. Franklin H. Littell, pro se.

## OPINION

GRIESA, District Judge.

This is a defamation action, commenced on July 1, 1970 by William F. Buckley, Jr., seeking damages for an alleged libel contained in a book entitled *Wild Tongues*. The defendants originally sued were the author of the book, Dr. Franklin H. Littell, and the book's publisher, The Macmillan Company.

The case was tried by the court without a jury. During the trial, Buckley and Macmillan reached a settlement and Macmillan was dismissed from the case.

Littell has appeared pro se in this litigation. However, it should be noted that following the disposition of the claim against Macmillan, the attorney who had been acting for Macmillan, David Blasband, Esq., continued in an *amicus curiae* capacity, and assisted in briefing and arguing the position of Littell. For this, the court wishes to express its appreciation.

This decision constitutes the court's findings of fact and conclusions of law with respect to Buckley's claims against Littell. For the reasons which will be hereafter explained, I have concluded that the writing in question is libelous and that Buckley is entitled to judgment. I further hold that the First Amendment protection enunciated in New York

Times Co. v. Sullivan, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964), and subsequent Supreme Court decisions, does not bar recovery by Buckley under the circumstances of this case.

*The Alleged Libelous Passage*

The book *Wild Tongues* was published by Macmillan on October 6, 1969. It was voluntarily withdrawn from distribution by Macmillan in July 1970, when the present action was commenced. Prior to this time the book sold 941 hard cover copies and 8,226 paperback copies.

The alleged libelous passage occurs at pages 50–51 of *Wild Tongues*, in which Littell characterizes Buckley as "the outstanding representative" of the function of "fellow traveler" with respect to fascism in the United States. This passage is contained in a subchapter entitled "The Fellow Traveler", which reads as follows (pp. 50–52):

> "Whisking about the edges of any totalitarian movement is the 'fellow traveler' pirouetting into the whirlpool and out again as the vortex draws more powerfully and then recedes. His role is as dangerous to social health and as important to building up totalitarian parties as the equally ambiguous figure of the pseudo-conservative. The fellow traveler to the Communists or fascists is a fascinating psychological study: fascination with brute force and its misuse plays an important role. Students of communism have commented at length upon the party member's 'psychology of the pawn'—his need to be misused and abused, to the destruction of his own personhood. The fellow traveler's responses are essentially feminine, registering the ambivalence of love and hate toward the master and mover.
>
> "The fellow traveler refuses to accept discipline and is therefore both used and despised by the party leaders. At the same time, he is dangerous to political movements and republican in-

> stitutions of integrity, because he functions as a deceiver. He appears at times to be independent, but, when a major issue is at stake, he follows the party line.
>
> "Perhaps the most famous type in recent years was Von Ribbentrop, pseudo-intellectual and champagne salesman, who was of great use to the Nazi government in giving an aura of respectability to international policies which, without a debonair front, might have been recognized readily for what they were: simple thuggery.
>
> "In America, the outstanding representative of this function is William F. Buckley, Jr., editor of *The National Review* and perennial political candidate. Buckley got his start as a smart young 'intellectual' by writing a book, *God and Man at Yale*, upon graduating from his *alma mater*. The book has been soundly exposed and condemned by professors and overseers and loyal alumni for falsely twisting facts and for sheer malice. *The National Review* and his syndicated newspaper column, 'On the Right,' frequently print 'news items' and interpretations picked up from the openly fascist journals and have been important and useful agencies for radical right attacks on honest liberals and conservatives.
>
> "Buckley has been caught out for misquotations (with quotation marks!) and for repeating radical right malice and rumor, but he never admits a mistake or apologizes to the victims. Like Westbrook Pegler, who lied day after day in his column about Quentin Reynolds and goaded him into a lawsuit, Buckley could be taken to court by any one of several people who had enough money to hire competent legal counsel and nothing else to do. Reynolds won his suit, of course, but it took all of his time and resources for most of three years, and he died shortly thereafter.[1]

---

1. The alleged libelous passage, as referred to in the complaint, included only these first five paragraphs of "The Fellow Traveler". At the trial of the action Buckley sought to

"As his lack of respect for the rules of the dialogue and his constant undermining of respect for American leadership and institutions reveal, Buckley is not a 'conservative' at all. The streak of ideological taint and moral nihilism is too pronounced, even though he is probably not under the direct control of any subversive party. When he publicly criticized Robert Welch of the John Birch Society, Buckley did not do it because Welch led a fascist-type conspiracy and used immoral tactics to undermine the constitutional order. Buckley said Welch was too extreme to be successful. When Dr. Martin Luther King, Jr. was assassinated, Buckley wrote in his column a tortuously reasoned explanation that the murderer represented the error of an independent conscience, which was Dr. King's error too.

" 'Truth,' asked Pilate, 'What is truth?' "

*Description of the Parties*

a. *William F. Buckley, Jr.*

For many years Buckley has been the owner and editor-in-chief of *National Review*, a well-known fortnightly journal founded in 1955. In 1968–69, at the time of the events involved in this lawsuit, *National Review* had a circulation of about 100,000 copies per issue. Its current circulation is about 110,000 copies per issue. Since 1964 Buckley has been the author of a syndicated newspaper column entitled *On the Right*, appearing three times a week. In 1968–69 the column was carried by about 250 newspapers. Today it is carried by 350 papers throughout the country. Buckley hosts a weekly television show entitled *Firing Line*, which was carried by about 75 commercial television stations in 1969.

Since then his program has been transferred to the Public Broadcasting Service network, and is now carried on more than 200 television stations in this network. The television program receives financing from a Ford Foundation grant.

The evidence in this case indicates that in 1968–69 Buckley's column *On the Right* was the third most widely sold column of political commentary in the country—ranking only behind the columns of Jack Anderson and David Lawrence. Today, following the death of David Lawrence, the Buckley column is second only to the Jack Anderson column.

Buckley is the author of ten books dealing mainly with political subjects. He has edited four other books, and has contributed materials for still other books and also for various magazines.

Buckley delivers between 50 and 60 lectures a year, mainly on political and educational matters.

Buckley is chairman of the board and part owner of The Starr Broadcasting Group, Inc., which owns radio and television stations as well as a book publishing company.

In 1965 Buckley was the unsuccessful Conservative Party candidate for Mayor of New York City. From 1969 to 1972 Buckley served on the five-member Advisory Committee on Information of the United States Information Agency. In 1973 Buckley was appointed as public member of the United States delegation to the 28th General Assembly of the United Nations.

It is stipulated that Buckley is a "public figure" as that term is defined in the cases dealing with First Amendment restrictions on libel actions. *See* Curtis Publishing Company v. Butts, 388 U.S. 130, 87 S.Ct. 1975, 18 L.Ed.2d 1094 (1967).

amend his complaint to include the remaining two paragraphs of the subchapter. Although the amendment was denied as belated, it became clear during the trial that these remaining paragraphs of the subchapter, like other portions of the book, must be considered in order to put the alleged libelous passage in context. Therefore, these paragraphs are quoted here.

### b. *Franklin H. Littell*

Littell is, and at the time he wrote *Wild Tongues* was, a professor in the Department of Religion at Temple University in Philadelphia, Pennsylvania. Following college and seminary training, Littell was ordained a Methodist minister in 1941. Littell obtained a Ph.D. degree in church history from Yale University in 1946.

In 1950–51 Littell was chief Protestant advisor to High Commissioner McCloy in Germany. Littell has held professorships at Emory University, Southern Methodist University and Chicago Theological Seminary. From 1966–69 Littell served as president of Iowa Wesleyan College, after which he took his present position at Temple University.

Prior to the trial of this action, Littell had written twelve books about subjects such as religious liberty and struggles between church and state. Two more books were in progress.

In 1966 Littell became the chairman of a new organization known as the Institute for American Democracy ("IAD"). The avowed purpose of the organization was to combat political groups and individuals associated with what were regarded as the extreme right and left of the American political spectrum. IAD published a periodical entitled "Homefront".

### Buckley-Littell Dispute Prior to Publication of Wild Tongues

Following the formation of IAD under Littell's chairmanship, IAD was the subject of critical comment from various sources, including Buckley's *National Review* in its issue of January 10, 1967.

On August 15, 1967 *National Review* carried a brief report regarding a speech which Littell was said to have made to the National Education Association. According to *National Review*, Littell had attacked "right-wingers" as being disloyal, and had stated that such persons needed to be "muted and rendered ineffective".

The August 15, 1967 *National Review* item led to an exchange of correspondence between Littell and Buckley, in which Littell accused Buckley of misrepresenting him and his views in various ways—principally in failing to point out that Littell was attacking extremists of *both* the left and the right.[2] Buckley rejected the charges. In addition, Buckley devoted one of his syndicated columns *On the Right* in February 1968 to a sharp criticism of IAD and Littell, whom Buckley termed "an abusive rhetorician." The title of this article was "Who Are the Totalitarians?" Finally, Buckley wrote an item for the March 12, 1968 *National Review* which quoted excerpts from the recent exchange of letters, and which again spoke critically of the IAD and Littell.[3]

### The Writing of Wild Tongues

Littell began work on *Wild Tongues* in the fall of 1968 and turned over his manuscript to Macmillan in March 1969.

Most of the book was apparently prepared by putting together various papers which Littell had written for seminars or other purposes. However, the section on Buckley was something which Littell wrote afresh.

Following the submission of Littell's manuscript to Macmillan, the editors in charge of the project at Macmillan directed that the book be submitted to counsel for review regarding possible libel problems. It appears that the only portion of the passage regarding Buckley which Macmillan's attorney ques-

---

2. The August 15, 1967 *National Review* item was based, not upon the actual text of Littell's speech, but upon an article by a newspaper reporter named Gaskie. In addition, it appears that Littell never actually delivered the speech, although the text may have been read on his behalf at the NEA.

3. Prior to the time Littell wrote *Wild Tongues*, he had seen the *National Review* item of August 15, 1967 and the *On the Right* column of February 1968. However, he had not seen the March 12, 1968 *National Review* item.

tioned was a sentence which, in the manuscript, read as follows:

"Buckley has been repeatedly caught out for deliberate misquotations (with quotation marks!) and for repeating radical right malice and slander, but he never admits a mistake or apologizes to the victims."

Macmillan's attorney requested documentation to support the statement that Buckley had knowingly published misquotations and repeated malicious and false statements. In response to this request, Littell's secretary sent Macmillan a copy of Buckley's *On the Right* column "Who Are the Totalitarians?" and some of the correspondence between Buckley and Littell which occurred in early 1968. This documentation was deemed by Macmillan's attorney to be insufficient. However, the book was on a rush schedule to obtain maximum sales to a large Methodist women's organization. The question of Littell's reference to Buckley was resolved by a change in wording. Macmillan requested that the sentence described above, as originally proposed by Littell, be changed to remove the words "repeatedly" and "deliberately" and to substitute "rumor" for the word "slander". No other changes were requested of Littell in the passage regarding Buckley. The Macmillan editors and Macmillan's counsel indicated to Littell their acquiescence in the following passage as revised:

"Buckley has been caught out for misquotations (with quotation marks!) and for repeating radical right malice and rumor, but he never admits a mistake or apologizes to the victims."

*Interpretation of Passage Regarding Buckley*

*Wild Tongues* is 184 pages long. It is subtitled, "A Handbook of Social Pathology". One of the main purposes of the book, as Littell describes it, was to inform members of the various Christian denominations in the United States regarding what Littell considered to be the threat to the churches posed by extremist political groups. Littell and Macmillan had received indications that the book might be used in study programs of the Women's Division of the United Methodist Church. The Women's Division numbers about 1,000,000 members. The actual sales of the book did not meet expectations.

Although *Wild Tongues* addresses itself to both the extreme left and the extreme right, it is fair to say that attention is mainly focused on the right wing. One of the principal themes of the book is that there is more actual and incipient fascism in America than most persons have any awareness of. A substantial part of the book is devoted to listing and describing certain characteristics which are said to be the earmarks of totalitarian organizations and philosophies, both of the right and the left. Littell's message is that if a group or organization has a majority of these characteristics, it should be recognized as being an incipient totalitarian movement. Littell urges that such movements are essentially conspiracies against the American government and should be outlawed.

There has been a certain amount of debate in this action as to what the alleged libelous passage regarding Buckley actually means.

Buckley contends that the book labels him as a fellow traveler of totalitarian fascism, and accuses him of misusing his prestige as a journalist to deceive the public by purveying fascist views under the guise of responsible conservatism. Buckley contends that the book further accuses him of engaging in libelous journalism of the kind authored by Westbrook Pegler against Quentin Reynolds resulting in a libel judgment against Pegler in the noted case of *Reynolds v. Pegler*, 223 F.2d 429 (2d Cir.), cert. denied, 350 U.S. 846, 76 S.Ct. 80, 100 L.Ed. 754 (1955).

Littell asserts that Buckley exaggerates the import of the alleged libelous passage. *First*, Littell denies that the

book accuses Buckley of being a fellow traveler of fascism. Littell argues that the book, properly interpreted, goes no farther than associating Buckley with the "radical right"—a political grouping discernibly different from fascism. *Second,* Littell denies that the book charges Buckley with *intentionally* using his journalistic position as a cover for fascist propaganda. Littell urges that the book only asserts that there is a frequent coincidence of views of Buckley and the radical right, which inevitably results in Buckley giving aid and comfort to radical right groups. *Thirdly,* with regard to the comparison between Buckley and Westbrook Pegler, Littell states that he did not intend to accuse Buckley literally of the same kind of conduct engaged in by Westbrook Pegler.

 The rule of interpretation in a libel case is that words alleged to be defamatory are to be taken in their natural meaning. Courts will not strain to interpret them in their mildest and most inoffensive sense. Mencher v. Chesley, 297 N.Y. 94, 99, 75 N.E.2d 257 (1947). It is necessary to make a judgment based upon the alleged libelous material as a whole, rather than on the basis of isolated or detached individual sentences or statements. November v. Time, Inc., 13 N.Y.2d 175, 178, 244 N.Y.S.2d 309, 194 N.E.2d 126 (1963). The test of whether a passage is libelous or not is what the overall effect would be upon an ordinary reader. Everett v. Gross, 22 A.D.2d 257, 254 N.Y.S.2d 561, 563, 254 N.Y.S.2d 561 (1st Dept. 1964).

 If we view the alleged libelous passage in *Wild Tongues* according to these rules, the proper interpretation is not difficult to arrive at. Buckley's interpretation of the book is clearly the correct one. Littell's attempt to suggest less harmful meanings to the various statements is, in my view, totally unrealistic. In this connection, a statement of Justice White in his concurring opinion in Greenbelt Cooperative Publishing Assn. v. Bresler, 398 U.S. 6,

22, 23, 90 S.Ct. 1537, 1546, 26 L.Ed.2d 6 (1970) is apposite. The discussion is in the context of the question of First Amendment limitations on libel actions.

"Should New York Times Co. v. Sullivan, 376 U.S. 254, [84 S.Ct. 710, 11 L.Ed.2d 686] (1964), be extended to preclude liability for injury to reputation caused by employing words of double meaning, one of which is libelous, whenever the publisher claims in good faith to have intended the innocent meaning? I think not.

\* \* \* \* \* \*

I see no reason why the members of a skilled calling should not be held to the standard of their craft and assume the risk of being misunderstood—if they are—by the ordinary reader of their publications."

In order to explain my conclusion as to the meaning of *Wild Tongues* with respect to Buckley, it is necessary to describe the book in some detail. In the alleged libelous passage, Buckley is charged with being the outstanding representative in America of the function of the fellow traveler, and it is clear that Buckley is being charged with being a fellow traveler of the fascists. Buckley is accused of playing a role dangerous to social health and important to building up totalitarian movements. Buckley is described as having certain characteristics said to be common to fellow travelers of totalitarianism—such as fascination with brute force and its misuse, a psychological need to be misused and abused, and "essentially feminine" responses. Buckley, being a fellow traveler, refuses to accept party discipline, but is nevertheless dangerous to political movements and republican institutions of integrity because he functions as a deceiver.

The alleged libelous passage contains a paragraph about the Nazi Von Ribbentrop. There is a statement to the effect that the Nazis attempted to use Von Ribbentrop to put up a "debonair front" and to give the Nazi movement an aura of respectibility.

Buckley's name appears immediately following the discussion of Von Ribbentrop. It is said, among other things, that Buckley's magazine *National Review* and his column *On the Right* are purveyors of materials "from the openly fascist journals". Buckley's magazine and column are described as "useful agencies" for radical right attacks on honest liberals and conservatives, and it is said that Buckley has been "caught out" for repeating radical right malice and rumor. The passage states that Buckley "could be taken to court by any one of several people" who could afford to do so, and Buckley is compared with Westbrook Pegler "who lied day after day in his column about Quentin Reynolds", resulting in the lawsuit, which Reynolds won.

In the remainder of the "Fellow Traveler" passage, it is said that Buckley constantly undermines respect for American leadership and institutions, and that he is "probably not under the *direct* control of any subversive party", the clear implication being, as expressly stated in the earlier part of the "Fellow Traveler" passage, that Buckley follows "the line" of subversive parties. Although it is noted that Buckley publicly criticized Robert Welch of the John Birch Society, the reader is led to believe that Buckley has no quarrel with the John Birch Society's "fascist-type conspiracy" and use of "immoral tactics to undermine the constitutional order."

A reader of *Wild Tongues* would obviously not read the "Fellow Traveler" section in isolation. The meaning of this section to him would be colored by what is said in the rest of the book about such subjects as totalitarianism, fascism and the role of the fellow traveler. These other references serve to emphasize the depth of the evil with which Buckley is being charged. They also show that what is said about Buckley in the "Fellow Traveler" section is not merely a string of loose epithets. Indeed the book undertakes to make a

kind of scientific definition of fascism in America, and to fix Buckley and others in their relation to such fascism.

The dust jacket of *Wild Tongues* describes the book as follows:

"WILD TONGUES, a perceptive and trenchant analysis of extremism, provides an authoritative guide to an understanding of the political and religious threats posed by both far right and left. In this pioneering work in establishing a typology of pathological movements and parties, Franklin H. Littell both defines the enemies of liberty and self-government and shows how democratic processes can be strengthened against them. He spells out, in specific terms, what the extremist groups mean to American life and supplies a checklist by which the pathological organization can be recognized."

*Wild Tongues* starts out by referring to the 1968 presidential campaign of George Wallace. It is said that this campaign was managed by two prominent "fascist type conspiracies"—the White Citizens' Councils and the John Birch Society. The book states that Wallace managed to collect about himself "every one of the organizations devoted to a rightest coup—from the paramilitary Minutemen to the night riders of the Ku Klux Klan" (p. 2).

*Wild Tongues* speaks of the churches in America as being "under savage attack from the fascist side" (p. 12). Littell quotes a letter from a minister describing the use of various pressure tactics in an attempted takeover of a church by the John Birch Society (pp. 12–14). Shortly before the "Fellow Traveler" section, there is a subchapter entitled "Thunder on the Right" which announces that "the most dangerous internal challenge to America comes from the fascist wing" (p. 35). This subchapter contrasts the "genuine conservatives" with the fascists and their fellow travelers, also labeled as "pseudo-

conservatives". There is the following passage (p. 36):

"The pseudo-conservative follows the lead of the demagogues, with a frenzy of unrestrained attacks on public policy and a minimal offering of constructive alternative proposals. Regarding the public debate as meaningless, the totalitarian demagogue is only present to evangelize his own ideology—never to learn. Tearing and rendering public confidence in the Constitution (and Bill of Rights!) where he can, his style is conspiracy, and his stench is disloyalty. The pseudo-conservative is the 'patsy,' the fellow traveler to the fascists; the genuine conservative is their mortal enemy."

Subsequently, there is a reference to persons (in general) who "are carefully laying the basis for a *coup d'etat* in their fascist-type literature (p. 43).

The organization most frequently cited as being in the totalitarian fascist camp is the John Birch Society, which is said to be "a disciplined party of pseudo-conservatives and fascists" (p. 37), and to show "striking parallels to the Nazi party" (p. 45).

Two of the four chapters of the book are devoted to the description of the identifying marks of extremist groups. Chapter II is entitled "How to Identify Totalitarian Movements" (pp. 59–92). This chapter starts out with the statement:

". . . but the malaise with which we are dealing is specific, objectively definable. That problem is the rise of disciplined conspiratorial movements whose goal is power and whose style of politics is contrary to the rule of liberty under law which republican constitutions and due process of law are designed to achieve."

Littell apparently believed it important that the extremist right-wing groups he was denouncing be labeled as "fascist" in order to prevent any misunderstanding as to their true nature.

Thus the following passage appears (p. 60):

"So too with the term 'radical right': the phrase is preferred by some writers who do not want to apply the precise rubric, which is fascism. 'Fascism' was the term chosen by the oldest movements of right-wing takeover, when Mussolini and his thugs betrayed the legitimate government of Italy in 1922, terrorized and destroyed all dissenting groups, and established the model followed with adaptations by Hitler, Franco, Peron, and a host of subsequent lesser lights. 'Fascism' is the term to apply to parallel movements and systems today, even though specialists note technical differences between Italian fascism, German Nazism, Spanish Falangism, and other radical right movements."

The book goes on to state that, by means of Littell's analytical method, "totalitarian conspiracies and actions can be defined by law as precisely as murder, arson and rape and . . . such definition is overdue" (p. 71). The book states that by this method it is possible to identify "organizations and parties and systems which have opted out of the life of dialogue, which are not in good faith in public meetings, and have in fact drawn the knife against all who stand in the way of their drive for power" (pp. 64–65). On the subject of fellow traveling, the book has this to say (p. 68):

"On the practical side, it is now perfectly possible to distinguish honest liberalism from fellow-traveling with the Communists, and honest conservatism from fellow-traveling with fascist-type movements. The failure to make such distinction, scientifically as possible as the distinction between measles and scarlet fever, is the major plague afflicting both the Republican and Democratic parties in the United States."

Littell describes fifteen "theoretical" identifying marks of totalitarianism (pp.

72–91) and sixteen "practical" characteristics of totalitarianism (pp. 95–111). I will only mention a few of these as illustrations of what Buckley is connected with when he is labeled as a fellow traveler of the fascist brand of totalitarianism.

Littell starts each list with anti-Semitism (pp. 72, 95). Under the heading "The Politics of Polarization", Littell states that totalitarians are "destructive of the rules of the dialogue and of the constitutional order itself", and intend "not orderly change but transfer of power by reversion to the law of the knife" (pp. 74–75). Under the heading of "The Cult of Violence" there is the statement that "the praise of violence toward the opposition is fundamental", and there is a description of the alleged attempts by the John Birch Society and its "fronts" to support lawless and brutal action by police—particularly against civil rights demonstrators. In this same section of the book, there is also a description of the use of the "big lie" against "faithful stewards of governmental office who resist totalitarian measures and movements". It is further stated (p. 82):

"The Dial-a-Lie telephone program of the John Birch Society, as well as the over 10,000 weekly radio programs of the agents of the radical right, are forms of sadism and barely subdued violence."

It is said that "amateur sleuths" are developed and that "both Communist and fascist organizations keep files on enemy persons—using the data for character assassination now and liquidation later" (p. 83). It is further stated that "amateur agents" have created "a new style of treason in our time," specializing in the "fifth column," which destroys constitutional order and trust, and which develops "large networks of espionage, subversion and conspiracy" (p. 83). In this connection, the book refers to an organization known as the Church League of America, and states that this organization boasts that its files contain the largest volume of negative information on individuals outside the FBI (p. 83).

The book states that in totalitarian politics, "Symbols of sadism and violence are approved" (p. 108). It is said that "vulgar and vicious forms of sedition are encouraged by disloyal public officials, with unpunished arson and murder the results" (p. 108). The book asserts that totalitarian supporters revert to primitive "justice" in the form of mob demonstrations, mob violence, and the takeover of legitimate organizations by various pressure tactics (pp. 108–9).

The ultimate recommendation is that totalitarian groups in America be exposed as conspiratorial and subversive and be outlawed (p. 113).

In Appendix 2 at the end of the book there is the following definition of "fellow traveler" (p. 131):

" 'Fellow-traveling' is to follow a 'line' fixed by someone else in another place, while pretending to integrity—and independence of discussion and decision." [4]

In Appendix 2 Littell lists a number of "Extremist Newspapers and Magazines". None are classified under the specific heading of "fascist". But a number of publications are listed under the headings of "Racist" and "Radical Right". Some of these are *The Cross and the Flag*, published by the Christian Nationalist Crusade; *American Opinion*, published by the John Birch Society; *Christian Crusade*, published by Billy James Hargis; the *Dan Smoot Report;*

---

4. Littell points to the fact that on the next page there is a reference to a type of persons called "innocents"—persons who are said to have been "taken in" by extremist groups and to have been used unwittingly. The idea is that fellow travelers can include not only those who intentionally deceive, but also those who are innocently used as messengers for extremist causes. However, Littell in his testimony admitted that he did not make clear in his book that fellow travelers include "innocents". He would do so, if he issued a revised edition.

and *Life Line*, published by the late H. L. Hunt. It should be noted that Buckley's magazine *National Review* is not included in any of the listed publications in Appendix 2.

In connection with the meaning of the alleged libelous passage relating to Buckley, attention should be given to the comparison that is drawn between Buckley and Westbrook Pegler. The statement is (p. 51):

> "Like Westbrook Pegler, who lied day after day in his column about Quentin Reynolds and goaded him into a lawsuit, Buckley could be taken to court by any one of several people who had enough money to hire competent legal counsel and nothing else to do. Reynolds won his suit, of course, but it took all of his time and resources for most of three years, and he died shortly thereafter."

The libel action of Quentin Reynolds against Westbrook Pegler was a case of unusual notoriety. It was described in detail in Louis Nizer's best-selling book *My Life in Court*, first published in 1963 and reprinted thereafter. Although Littell does not recall reading the Nizer book, he recalls reading a description of the case in another book.

Pegler had made a scurrilous personal attack upon Reynolds, accusing him of cowardice as a war correspondent, of having shared the profits of fraudulent military contractors, of having proposed to the widow of Heywood Broun at her husband's funeral, of engaging in improper sexual practices, and so forth.

Reynolds won his libel action against Pegler, and certain newspaper publishers. Reynolds v. Pegler, 223 F.2d 429, 431 (2d Cir. 1955).

### Summary of Interpretation

The alleged libelous passage regarding Buckley, taken in the context of other relevant portions of *Wild Tongues*, makes accusations against Buckley of a profoundly serious nature. It not only labels him as the outstanding representative in this country of the function of fascist fellow traveler, but it spells out in considerable detail the specific evils with which such a fellow traveler is associated. These include disloyalty to the government of this country, advocacy of conspiratorial overthrow of the government, devotion to violence and disruptive tactics for the subversion of our institutions, including churches.

Littell appears to argue that, even though Buckley is labeled as a fellow traveler of the extremist movements being denounced, it does not follow that the book connects Buckley with each and every evil described in the book. But the evils I refer to here are emphasized repeatedly through the book as being the basic identifying characteristics of fascism. I believe it is inevitable that a reader of the book would take it to mean that Buckley—as the alleged outstanding fellow traveler of fascism in America—subscribes to these basic evil tenets.

In addition, the book would convey to an ordinary reader the message that Buckley is deliberately using his prominent journalistic position to convey fascist views under the guise of responsible conservatism. This is the inevitable effect of the passages charging that a fellow traveler functions "as a deceiver" (p. 50), "while pretending to integrity" (p. 131). Finally, Buckley is accused of engaging in the type of libelous journalism practiced by Westbrook Pegler against Quentin Reynolds.

### Buckley's Evidence Regarding Alleged Libel

Buckley testified at the trial that his career has been mainly devoted to making a case for a conservative dissenting point of view on social and political issues. He favors the private over the public sector in the economy. He views the communist threat from abroad as the principal danger to world peace.

Buckley testified as to the meaning of "fascism" and "radical right". The characteristics of fascism, in its full development are: Absolute power of the state apparatus and subordination of the

judicial and legislative branches to the executive; suppression of the electoral process and dissenting parties; unrestricted use of the military and police power in disregard of individual civil rights; use of terror and brute force as weapons of suppression; anti-Semitism or other forms of racism; absence of any meaningful political dialogue.

In his testimony at the trial, Buckley gave the Ku Klux Klan as an example of a fascist-type organization in America, because it favors terrorism and repudiates individual rights. Buckley also characterized the group known as "Minutemen" as fascistic, since they purported to be arming themselves, although this group clearly has no actual program for taking over the country.

Buckley testified that the term "fascist" has a different meaning from "radical right". Buckley defined the radical right as a congeries of highly dissatisfied Americans, with irresponsible views, but lacking in the intent to use brute force to achieve their ends. Buckley would classify persons such as Carl McIntire, Billy James Hargis, and the late H. L. Hunt as radical rightists, but not as fascists. Buckley would similarly classify the John Birch Society.

Buckley testified that he has been intent upon maintaining a distinction between himself as a "responsible conservative" and persons associated with the fascist or "irresponsible" right. According to Buckley this distinction is a crucial one for his career.

At the trial, Buckley testified about his condemnation of the John Birch Society as illustrative of this distinction. Apparently, in the early 1960's after the John Birch Society first surfaced, Buckley was highly critical of the society's leader, Robert Welch, because of his thesis that President Eisenhower and other American leaders were agents of Communism. Buckley considered such views delusions. However, the John Birch Society indicated that its members could accept or reject these views of Welch, and Buckley for a time refrained from condemnation of the society as a whole. However, in 1965 Buckley decided upon an all-out condemnation of the John Birch Society, and an entire issue of *National Review* in October 1965 was devoted to a sharp attack upon the society. In his trial testimony Buckley referred to the views of the John Birch Society as "lunacies".

Buckley also testified that at one point *National Review* ran an eight-page expose regarding a proto-fascist group called the Liberty Lobby.

Another example of Buckley's conflict with a radical right related to one Kent Courtney, whose group Buckley labeled at one time as "kooks", and who reciprocated with sharp attacks on Buckley.

Buckley testified that for fifteen years he has been subject to denunciation by various members of the "irresponsible right".

Buckley testified that his syndicated column and *National Review* do not pick up items from fascist or radical right journals in order to circulate them. On the other hand, *National Review* has referred to such items occasionally for the purpose of denouncing them. For instance, Buckley published two articles criticizing *Playboy* magazine for giving what Buckley considered undue attention to George Lincoln Rockwell and his American Nazi party.

Buckley specifically denied each of the allegations of the "Fellow Traveler" passage of *Wild Tongues*.

Allard Lowenstein, a former Democratic Congressman, a former chairman of the Americans for Democratic Action, and a present member of the Democratic National Committee, testified for Buckley. Lowenstein testified that Buckley cannot be fairly described as either a fascist or a radical rightist or a fellow traveler of either. Lowenstein testified that it is "outrageous" to say that Buckley picks up materials from openly fascist journals. According to Lowenstein, Buckley has the reputation of a sophisticated journalist, not giv-

en to irresponsible personal attacks on individuals.

Warren Steibel, producer of Buckley's television program *Firing Line,* testified that if the characterizations of Buckley contained in *Wild Tongues* were to gain credence, the program could not remain on the air. The Ford Foundation would not sponsor it. Harry Elmlark, editor of Buckley's syndicated column *On the Right,* testified that, if Buckley acquired a reputation in accordance with the description in *Wild Tongues,* this would be the death of the column. Both Steibel and Elmlark stated that the accusations against Buckley in *Wild Tongues* are in fact false.

*Littell's Evidence Regarding Alleged Libel*

The authorities relating to the law of libel will be discussed later in this opinion, including the decisions regarding the First Amendment limitations on a libel action in the case of a public figure. However, I wish to summarize briefly at this point the basic rule regarding a public figure's burden of proof in a libel action.

■■ A public figure such as Buckley cannot recover in a libel action unless he proves with convincing clarity that the defendant knew that the libelous statement was false, or made the statement with reckless disregard of whether it was true or false. New York Times Co. v. Sullivan, 376 U.S. 254, 279–80, 285–86, 84 S.Ct. 710, 11 L.Ed. 686 (1964); Gertz v. Robert Welch, Inc., 418 U.S. 323, 336, 342, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974). The reckless disregard requirement has been defined to mean that the defendant must be shown to have had an awareness of probable falsity. St. Amant v. Thompson, 390 U.S. 727, 88 S.Ct. 1323, 20 L.Ed.2d 262 (1968). It is in the context of these basic rules that I am now setting forth a summary of the evidence about what Littell believed and did not believe regarding the statements made about Buckley in *Wild Tongues.*

Littell did not subscribe to *National Review* or read Buckley's column *On the Right* regularly, but read *National Review* and the column from time to time. His testimony is that he "spent a good many hours all in all reading into *National Review*" before the time he wrote *Wild Tongues.* Buckley was an occasional subject of discussion with Littell's colleagues and in seminars which Littell conducted. Certain books used in these seminars contained references to Buckley.

Littell testified that in about 1961 or 1962 he commenced keeping a file on Buckley. Littell maintained personal journals in which he wrote down items of interest, including occasional notes regarding Buckley.

Littell did no research or checking in his files or elsewhere in connection with the writing of the passage about Buckley in *Wild Tongues,* except for producing the materials to Macmillan relating to his personal disagreement with Buckley in 1967–68. Littell has testified that he basically relied on memory and impressions in saying what he did about Buckley.

In connection with the trial of this action, Littell was asked to produce his file about Buckley, as well as the notes in his journals relating to Buckley and any other materials which might have formed a basis for the statements about Buckley in *Wild Tongues.* Littell produced some materials from his journals and files, but could not locate his complete collection. In addition, a large number of items from *National Review* and other publications were produced, which did not come from Littell's original files, but were obtained by Littell and his wife through research done in libraries and elsewhere in preparation for the trial of this action. Littell testified that he may not have read all of these items, and that there may have been other items not produced that he did read. But the items were produced as samples of the type of information which Littell says came to his attention over the years.

■ It is necessary to bear in mind that it is not Littell's burden under New York Times Co. v. Sullivan, *supra*, and the other relevant decisions, to show that he made an investigation regarding his statements or that he had a documentary basis for his statements. However, at the trial of this action, Littell testified in great detail regarding what he intended to say about Buckley in *Wild Tongues,* about his actual beliefs regarding Buckley, and the sources of those beliefs. This testimony, along with all the other relevant evidence, must be considered in determining whether *Buckley* has ultimately sustained his burden of proof.

> "There is no doubt that evidence of negligence, of motive and of intent may be adduced for the purpose of establishing, by cumulation and by appropriate inferences, the fact of a defendant's recklessness or of his knowledge of falsity." Goldwater v. Ginzburg, 414 F.2d 324, 342 (2d Cir. 1969), cert. denied, 396 U.S. 1049, 90 S.Ct. 701, 24 L.Ed.2d 695 (1970).

At the risk of repetition, I feel that it is necessary at this point to dwell again upon certain aspects of the meaning of the book. As already indicated, one of the basic purposes of the book was to help the reader to understand the distinction between a genuine conservative and a fascist or a fascist fellow traveler. Littell so testified, stating that "the whole basic purpose of the book was to make a basic distinction between honest conservatism, however hardheaded, and fascism; and honest liberalism, however idealistic, and Communism or fellow traveling with Communism".

In drawing this important distinction between the genuine conservative and the fascist or the fascist fellow traveler, Littell in *Wild Tongues* gives his extensive elaboration of the meaning and identifying characteristics of fascism— disloyalty to the government, advocacy of violence, disbelief in democratic institutions, desire for a totalitarian state, contempt for individual liberties, and so forth. I have already concluded that a normal reader would take the book to mean that Buckley—the alleged "outstanding" fascist fellow traveler in America—was knowingly associated with these basic purposes. Also, as indicated earlier, the book charges Buckley with disreputable journalistic practices —deliberately purveying fascist propaganda under the guise of responsible conservatism, and committing libels against individuals.

It now is evident from Littell's trial testimony that there are substantial differences between what the book states and what Littell in fact believed.

Littell admitted at the trial that he does not in fact believe that Buckley is a fascist, or a fellow traveler of fascism, or a fellow traveler of totalitarianism. He did not believe any of these things at the time he wrote *Wild Tongues.* He did not intend to say any of these things in *Wild Tongues.* What he does believe, and did believe when he wrote the book, is that Buckley was a fellow traveler of —or "in the orbit of"—the radical right.

On this point, the following testimony is illustrative. The court asked Littell about the matter of calling Buckley a fellow traveler of fascism.

> "Are you telling me you didn't mean to say that?
>
> THE WITNESS: No.
>
> THE COURT: You did not?
>
> THE WITNESS: Yes, I am telling you that.
>
> THE COURT: You did not mean to say that Mr. Buckley was a fellow traveler of the fascists or fascism, is that right?
>
> THE WITNESS: That is right.
>
> THE COURT: You would say that that is false, to say such a thing, would you?
>
> THE WITNESS: I certainly wouldn't say it that way."

Subsequently there was the following:

> "THE COURT: What is he a fellow traveler of?

THE WITNESS: He is a fellow traveler of the radical right or the right wing."

Littell, in his testimony, conceded the correctness of Buckley's differentiation between fascism and the radical right, to the effect that the radical right consists of dissatisfied, highly conservative Americans, lacking, however, the malign characteristics of fascism.

Littell agreed that the distinction between fascism and the radical right is not a narrow distinction or a mere matter of semantics. He testified:

"Now, if you speak loosely or carelessly, as is sometimes done, you will end up with a right wing or a radical right way of thinking, a reference which doesn't make the necessary distinction and somebody will think, well, when you say radical right you mean fascism." [5]

Littell advanced a two-step proposition in his defense: First, that in *Wild Tongues,* he only intended to call Buckley a fellow traveler of the radical right; and second, that he had a good faith belief in Buckley being a fellow traveler of *this kind,* which was supported by numerous sources which he testified about.

Putting aside momentarily Littell's testimony about what he intended to say in the book, the above evidence leads to the inescapable conclusion that there is a sharp difference between what the book actually says and what Littell believed. As I have already found, the book plainly and emphatically calls Buckley a fellow traveler of fascism. Moreover, the book is careful to indicate that the specific evils described therein relate to fascism, and *not* to something less

dangerous—such as the radical right. But Littell does not, and did not, believe that Buckley was a fascist, or a fellow traveler of fascism or totalitarianism.

■■ This would seem to lead to the conclusion that this serious accusation against Buckley in *Wild Tongues* was made by Littell with knowledge of its falsity. But we must consider the contention, relied on by Littell, that he was acting in good faith, and had no knowledge of the falsity of the statement, because he did not intend to accuse Buckley of being a fellow traveler of fascism. On this point, I find Littell's testimony difficult to credit. It is hard to believe that words which have such a plain meaning were not intended by their author to have this meaning. At the very least, I must conclude that Littell was acting in reckless disregard of the truth when he used words which clearly spell fascism when he did not indeed believe they applied to Buckley. An author cannot ". . . automatically insure a favorable verdict by testifying that he published with a belief that the statements were true." St. Amant v. Thompson, 390 U.S. 727, 732, 88 S.Ct. 1323, 1326, 20 L.Ed.2d 262 (1968).

Regarding the accusation in *Wild Tongues* that Buckley "functions as a deceiver", Littell testified that he did not believe that Buckley intentionally or deliberately acted in this way, but did so innocently. Littell testified:

"I am not accusing Mr. Buckley of deliberately deceiving anybody."

Still later, there was the following colloquy:

"THE COURT: But you would not have wanted to write expressly the statement, Mr. Buckley functioned as

---

5. It will be recalled that at p. 60 of *Wild Tongues* there is the statement:
"So too with the term 'radical right': the phrase is preferred by some writers who do not want to apply the precise rubric, which is fascism."
The position taken in the book is that there are certain specific evils, which should be clearly understood as fascism. Buckley was labeled in the book as a fellow traveler of fascism.

In his trial testimony, Littell agreed that there is indeed a political grouping, distinct from fascism, known as the radical right, and Littell says that his actual belief is, and was, that Buckley is a fellow traveler of the radical right.
But *Wild Tongues,* by its own declaration is dealing with fascism, not the radical right; and the elaborately described characteristics of conspiratorial tactics, etc. clearly relate to fascism.

a deceiver intentionally for the John Birch Society or any of those other groups you referred to, right?

"THE WITNESS: I agree."

Littell went so far as to testify that when he said in the alleged libelous passage that a fellow traveler "functions as a deceiver", he was simply speaking in general terms, not intending to refer to Buckley in particular. Moreover, with respect to his statement in Appendix 2 that a fellow traveler follows a line fixed by someone else "while pretending to integrity"—Littell testified that this was "an infelicitous phrase".

Littell similarly retreated, at the trial, from the accusation in the book that Buckley was guilty of libelous journalistic practices in the manner of Westbrook Pegler. In the first place, Littell indicated that this serious charge was placed in the book almost by accident. Littell stated at the trial:

"And it was just by chance that I even threw that phrase in. I might just as well not have, but it just happened to come up as I was writing."

At another point, Littell testified:

"I mean it is more accidental than we are treating it, you see."

Specifically with regard to the question of whether Littell believed that Buckley had engaged in the same kind of defamation for which Pegler was found liable Littell testified:

"THE COURT: As far as Buckley, let me get this straight. You did not believe that Buckley was leveling against these people personal remarks or attacks about their sexual habits, their morals, their business ethics, their cowardice, anything like that, did you?

THE WITNESS: I don't know of any case where he has done such a thing.

THE COURT: You did not mean to say that in this book?

THE WITNESS: No.

THE COURT: And you didn't know of any such case, right?

THE WITNESS: Right."

It would appear clear that, with respect to the allegations in *Wild Tongues* that "Buckley functions as a deceiver" and engages in libelous personal attacks on individuals, there are sharp differences between what the book says and what Littell actually believed. On the question of Littell's good faith, based on his contention that he did not mean to actually make these harsh accusations, again I find it difficult to credit Littell's testimony. And again, I must conclude that Littell was at least acting in reckless disregard of the truth when he made the accusations against Buckley contained in *Wild Tongues*.

What has just been said is nearly sufficient in and of itself to demonstrate the liability of Littell in this action. However, for the sake of completeness, it is necessary to describe in some detail other features of the evidence.

### Additional Evidence Regarding Buckley's Political Orientation

In his testimony at the trial, Littell sought to explain the sources of his belief as to Buckley's political orientation.

Littell sought to show that Buckley had associated himself with organizations in which John Birch Society members and other radical right supporters were involved. Littell referred to the fact that at one time Buckley was listed as a Contributing Editor of *The American Mercury*. Littell produced an article from a 1953 issue of this magazine by J. B. Matthews entitled "Reds and Our Churches", in which Matthews charged that substantial numbers of Protestant clergymen were supporting the Communist apparatus.

Littell also referred to the fact that Buckley was listed as a participant in *The Campaign for the 48 States*, a group which apparently existed from 1955 to 1959, and which favored certain proposed constitutional amendments to limit the power of the federal government. Littell's information is that 16 out of about 100 members of this group

were subsequently affiliated with the John Birch Society.

Buckley was also listed as a member of *The Committee Against Summit Entanglements*, which was formed in 1959 to protest the visit of Khrushchev to the United States. According to Littell, most of the members were later identified with the John Birch Society.

Littell refers to the fact that in 1959 Buckley appeared at a rally in Chicago with Robert Welch of the John Birch Society and with another alleged prominent member of the radical right, Kent Courtney.

Buckley was also an organizer of the *Committee for the Monroe Doctrine*, which was formed in 1962 to protest President Kennedy's handling of the Cuban missile crisis. Littell asserts that about 26 out of 160 members were connected with the John Birch Society.

Littell does not even contend that this evidence shows that Buckley was a fellow traveler of fascism, as defined in *Wild Tongues*. Littell argues that the evidence *does* show that Buckley was in the orbit of the radical right. However, even on this point, Littell was aware of the following circumstances.

Buckley broke with *The American Mercury* in 1955, and later took the position that no one connected with *The American Mercury* could appear on the masthead of *National Review*.

With respect to any possible alliance between Buckley and Kent Courtney, events in 1965 clearly showed that it no longer existed, if it ever had. At this time Courtney was attacking Buckley as "sophomoric", and Buckley was charging that Courtney and his followers were "kooks".[6]

With regard to any claimed association with Robert Welch or the John Birch Society, it is clear that Buckley was never a member of the Society, nor does *Wild Tongues* make any accusation

to this effect. As far as Littell thinking that Buckley was a sympathizer of the John Birch Society, Littell read the *National Review* item of November 19, 1963, in which Buckley denounced Welch as a believer "in a cluster of political unrealities". In this article, however, Buckley stated that he had considerable admiration for the majority of those members of the John Birch Society whom Buckley had met or corresponded with—judging them as individuals, not as members of the Society. Littell also knew that by 1965 Buckley had gone much farther in his repudiation of the John Birch Society. Littell read the October 19, 1965 issue of *National Review*, containing a sharp critique by Buckley both of the leadership of the John Birch Society and the activities of its members. Among the comments were:

> "One continues to wonder how it is that the membership of the John Birch Society tolerates such paranoid and unpatriotic drivel."

This issue of *National Review* contained an article by Frank S. Meyer, which concluded with the statement:

> "However worthy the original motivations of those who have joined it and who apologize for it, it is time for them to recognize that the John Birch Society is rapidly losing whatever it had in common with patriotism or conservatism—and to do so before their own minds become warped by adherence to its unrolling psychosis of conspiracy."

It should be remembered that in *Wild Tongues* Littell charges that the John Birch Society is a fascist conspiracy. Littell reiterated this position at the trial. Also, at the trial Littell admitted that he did not really regard Buckley as a fascist or fascist fellow traveler. It is clear that Littell knew far more about the differences between

---

6. Information about Buckley's break with *The American Mercury* and Buckley's disagreement with Courtney are contained in a biographical summary of Buckley which Littell had read prior to writing *Wild Tongues*.

Buckley and the John Birch Society than he revealed in *Wild Tongues*.

At the trial of this action, Littell referred to some thirty items from *National Review* and Buckley's column *On the Right* as indicating that Buckley was a fellow traveler of the radical right. These items span the period from 1957 until the time of the publication of *Wild Tongues*. In general, Littell contends that these articles illustrate a coincidence of views between Buckley and the radical right, and also illustrate the fact that *National Review* was willing to accept articles from persons connected with the radical right.

For instance, Littell refers to an article in the October 5, 1957 *National Review* by Revilo Oliver, who later became a member of the board of the John Birch Society. Littell refers to an article in the June 19, 1962 *National Review* by Jacques Soustelle. Littell testified that Soustelle later became a leader of a fascist faction in French Algeria. Littell indicated that *National Review* had printed articles "dozens of times" over a five-year period featuring people later exposed as genuine fascists.

However, the articles by Oliver and Soustelle are the only specific examples produced by Littell. Also, the contents of the articles are anything but fascist. The Oliver piece contains a harmless discussion of the slim chances of political conservatives in America. The Soustelle article protests against the possible abandonment by France of Algeria's French population.

Among the *National Review* articles which Littell points to as illustrating Buckley's right-wing orientation are the following:

June 29, 1957 (criticism of Supreme Court decision in Brown v. Board of Education);

May 8, 1962 (criticism of Ralph Bunche for alleged distortion of the activities of the Katanga Freedom Fighters);

May 31, 1966 (criticism of a proposed civil rights law which would cover the sale or rental of private houses).

In addition, Littell has produced photocopies of the covers of certain issues of *National Review*, showing that articles were being carried on the following subjects:

April 5, 1966 (favoring the police on the subject of proposed Civilian Review Boards);

May 16, 1967 (regarding Rhodesian Prime Minister Ian D. Smith, and calling him "Rhodesia's George Washington").

Unfortunately the articles themselves were not introduced into evidence by either party.

It would serve no useful purpose to set forth a detailed analysis of all these materials. However, I have reviewed them carefully. Far from supporting any conclusion that Buckley sympathizes with fascism, or with the conspiratorial, totalitarian methods and goals of fascism as outlined in *Wild Tongues*, these materials positively rebut any such conclusion.

Littell refers to three books as supporting his thesis that Buckley is a fellow traveler of the radical right. These are: *The Extremists*, by Mark Sherwin, published in 1963; *Danger on the Right*, by Arnold Forster and Benjamin R. Epstein, published in 1964; and *The Farther Shores of Politics*, by George Thayer, published in 1967. Littell testified that *Danger on the Right* was perhaps his most important source. Indeed, *Danger on the Right* has an entire chapter on Buckley and *National Review*. This book states (p. 241):

". . . Buckley is one of the leading fellow travelers of the American Radical Right."

*Danger on the Right* attempts to develop the thesis that Buckley allows himself to be linked with persons and organizations on the radical right, including the John Birch Society, and has views often

coinciding with such persons and organizations.

It should be noted that *Danger on the Right* was written before Buckley's thoroughgoing denunciation of the John Birch Society in 1965, as Littell well knew. Moreover, at its worst, *Danger on the Right* falls far short of linking Buckley to fascism, as is done in *Wild Tongues*. The same is true of the other two books referred to.

Littell testified that he had increasing suspicions about whether Buckley was connected with the radical right (although not fascism), which developed over a period of several years before the writing of *Wild Tongues*. Yet, it is interesting to note Littell's testimony in response to questioning about whether he had made any public comments during these years connecting Buckley with the radical right. Littell stated that the bishops of his church set up a committee on extremism in 1964 and appointed Littell chairman, and that from 1964 to 1969 he lectured frequently on the dangers of extremism throughout the country. Sometimes a question would come up about where Buckley stood in the political spectrum. Littell testified:

"Q Over that five-year period when Buckley's name came up from time to time in these lectures did you ever describe him as a fellow traveler of the radical right?

A I don't think that I ever did."

Littell testified that his "basic attack" during this time was on the John Birch Society and on its various fronts, and on people "who clearly were following the line", such as Billy James Hargis and Edgar Bundy.

Littell testified that at some point his misgivings about Buckley's political complexion led him to discuss the matter with two persons who were mutual friends of himself and Buckley—Joseph Uihlien and Will Herberg. Littell cannot clearly remember the times of these conversations, but believes that they were before the fall of 1967, when Littell's correspondence with Buckley started. According to Littell, he told both Uihlien and Herberg that he thought Buckley was in the orbit of the radical right, or "playing footsie" with the radical right. Both Uihlien and Herberg told Littell that he was mistaken. Herberg stated that Buckley was trying to give a new birth to conservatism in America. They both urged Littell to check with Buckley.

According to Littell, he did write to Buckley. The correspondence which he has identified in this regard is the same correspondence involved in the dispute which Littell had with Buckley in late 1967 and early 1968, which has been described earlier in this opinion. Certain statements of Littell's in his letters to Buckley are of interest on the subject of whether or not Littell actually believed that Buckley was a fellow traveler of fascism or the radical right.

In a letter of November 21, 1967 to Buckley, Littell stated:

"I appreciated your recent newspaper column attempting again to distinguish between honest conservatism and fascist activities.

\* \* \* \* \* \*

"Since I appreciate some of the positions you have taken, and especially your effort to maintain an honest and non-fascist conservatism, I think it appropriate to protest that I was misinterpreted in your magazine and that you must remember that one of the marks of a real conservative is that he checks his sources."

In a letter dated January 14, 1968 to Buckley, Littell stated:

"I have often taken pains in response to questions following public lectures to distinguish your work from that of the fascists, and I think that if you are truly a conservative you will agree that I am entitled to the same courtesies."

Finally, in a letter dated February 14, 1968 to Buckley, Littell stated:

"I have not received an answer to my letter to you under date of Janu-

ary 14th, in which I protested the misuse of my paper prepared for the NEA Conference last summer in the Twin Cities, and pointed out to you that honest conservatives and honest liberals should stand together against the Extremist elements. I also indicated that I have carefully avoided attacking you in public because I believe that you belong to the former category."

Littell now takes the position that he was not completely sincere in these rather complimentary statements, but that he was simply being diplomatic. However, it is my view that these statements do indeed have significance in showing Littell's belief about Buckley at that time. They are consistent with his admission that in five years of public lectures he never stated that Buckley was a fellow traveler of the radical right.

Littell testified that the turning point in his decision that Buckley belonged in the orbit of the radical right came as a result of Buckley's column of February 10, 1968, referred to earlier in this opinion, entitled "Who Are the Totalitarians?" It would serve no useful purpose to analyze this particular problem in any further detail. Whether or not "Who Are the Totalitarians?" would justify anybody in linking Buckley to the radical right is a subject which could be debated. But for the purposes of the present case, it is sufficient to say that there is nothing whatever in this article which comes close to indicating *fascist* sympathies on the part of Buckley. Indeed, no such contention is made by Littell.

*Additional Evidence Regarding Buckley Picking Up Items From "Openly Fascist Journals"*

I have already described Littell's testimony that he did not believe that Buckley was *intentionally* using his journalistic position to purvey fascist doctrine, although this may have occurred "innocently". Moreover, I have already held that this is contrary to what the book actually stated. I will now re-

fer to certain additional evidence on this subject.

Littell testified that over the years he had learned, either through his own reading or through information from students and others, of ten or a dozen instances where Buckley's writing "showed a most marvelous parallel to what appeared in the other radical right journals."

When asked to list what he was referring to in *Wild Tongues* as "openly fascist journals", Littell specified the John Birch Society's *Bulletin,* Kent Courtney's *Independent American,* Gerald L. K. Smith's *The Cross and the Flag,* H. L. Hunt's *Life Line,* Frank Capell's *Herald of Freedom,* and Billy James Hargis' *Churchmanship and Politics.* After indications of some doubt, Littell also included Edgar Bundy's *News and Views.*

Although Littell testified that he did considerable research prior to the trial, he was only able to provide two specific instances of coincidence between Buckley's writings and materials in the alleged fascist journals. Both of these instances related to criticisms of Littell's Institute for American Democracy ("IAD").

The IAD was publicly announced on November 18, 1966. The John Birch Society *Bulletin* made an attack upon the IAD on December 10, 1966. Frank Capell's *Herald of Freedom* attacked the IAD in the issue of December 30, 1966. One month later, on January 10, 1967, a criticism of the IAD appeared in *National Review.* In the January 1967 issue of Bundy's *News and Views* there was also an attack upon the IAD. Other items appeared in Richard Cotten's *Conservative Viewpoint* of January 12, 1967, and in a publication issued by Billy James Hargis in early 1967.

It also appears that in the June 10, 1968 issue of *News and Views* there was a further attack on the IAD—and on Steve Allen. Buckley's column *On the Right* for July 25, 1968 contained a simi-

lar criticism. Both of these items apparently resulted from Steve Allen's appeal for funds for the IAD. Finally, the November 1968 issue of *News and Views* again attacked the IAD. The latter item was expressly cited, with approval, in the November 1968 issue of *National Review*.

The conclusion I reach from the evidence on this subject is that Littell had an honest belief that there were instances where items of information and points of view were written about by Buckley and by the right-wing publications Littell referred to. Whether the latter publications could reasonably be classified as "fascist" is a question which I am not prepared to resolve on the present record, and do not need to resolve. The main point is that *Wild Tongues* accuses Buckley of deliberately acting as a deceiver in the purveying of fascist material. This accusation materially exceeded anything which Littell honestly believed.

*Additional Evidence Regarding the Comparison with Westbrook Pegler*

I must return at this point to the following passage in *Wild Tongues* (p. 51):

> "Like Westbrook Pegler, who lied day after day in his column about Quentin Reynolds and goaded him into a lawsuit, Buckley could be taken to court by any one of several people who had enough money to hire competent legal counsel and nothing else to do. Reynolds won his suit, of course, but it took all of his time and resources for most of three years, and he died shortly thereafter."

One question explored at the trial was whether Littell knew what it was that Westbrook Pegler had done which constituted the basis for this alleged comparison. Littell testified that he had read a description of the Reynolds v. Pegler libel action shortly before writing *Wild Tongues*. Littell admitted that it would be a reasonable assumption that he knew the nature of Pegler's lies about Reynolds when he wrote *Wild Tongues*. However, later in his testimony Littell denied that he really had in mind the scope of what Pegler had done. Littell's basic position on this issue was that he was not in fact attempting to draw an actual comparison between Buckley and Pegler, or to say that Buckley lied about individuals in the way that Pegler had done.

Littell testified that what he meant to say was that Buckley misrepresented the *positions* of prominent persons such as Martin Luther King, Jr., the Kennedy brothers, and other prominent persons in politics and religion. What Littell had in mind was that Buckley "hounded" and "goaded" such people, rather than lying about them in any conventional sense.

Littell particularly objected to what he termed Buckley's attacks on Martin Luther King, Jr. Littell referred to a Buckley column of October 21, 1962, in which Buckley questioned the motivation of King, a renowned exponent of peaceable opposition to racial segregation, in seeking an interview with Ahmed Ben Bella, said by Buckley to be a confirmed, militant terrorist in Algeria. Littell also referred to Buckley's column of August 18, 1965 commenting on the Watts riot, and making a general denunciation of lawlessness. This column referred to "the anarchic teachings of the Mario Savios [the leftist student leader] and the Martin Luther Kings and their disciples". Finally, Littell referred to Buckley's column of April 10, 1968, commenting upon the assassination of King. This column expresses deep sorrow about King's death, speaking of it as martyrdom, but also notes that King was planning to flout the law at the time he was killed.

Nevertheless, when Littell was asked if he knew of any instances when Buckley actually lied about King, Littell responded that "lies are matters of fact", and he could recall no instances of such lies.

Littell produced from Buckley's writings a number of other instances of sharp attacks upon individuals. For instance, there was an item in *National Review* of June 29, 1957 referring to A. J. Muste, Dorothy Day, and Stringfellow Barr as "pacifist fellow-travelers" with strong implications that they were allied with Communism or socialism. A. J. Muste and Dorothy Day were both religious leaders whom Littell greatly admired. Stringfellow Barr was president of St. John's College in Annapolis, Maryland.

A later example is a *National Review* item of December 27, 1966 in which it is said that Murray Kempton of the *New Republic* and *New York Post* "can't stand the F.B.I. because the F.B.I. can't stand Communists". Littell testified that in his view this was "a slanderous reference".

There was reference at the trial to the libel action by Linus Pauling against *National Review*. Pauling charged that he had been libeled by two articles in the *National Review* of July 17, 1962 and September 25, 1962, in which Pauling had been called a Communist fellow-traveler. Littel was asked whether he relied on this situation in connection with the writing of *Wild Tongues*, and Littell said that he did not. He stated that "Pauling is not one of my favorite people". In any event, the action by Pauling was dismissed. It was held that, although the statements were libelous *per se*, Pauling had not sustained his burden of proving knowing falsity or reckless disregard for the truth. Pauling v. National Review, Inc., 49 Misc.2d 975, 269 N.Y.S.2d 11 (Sup.Ct.N.Y. County 1966), aff'd, 27 A.D.2d 903, 281 N.Y.S.2d 716 (1st Dept. 1967), aff'd, 22 N.Y.2d 818, 292 N.Y.S.2d 913, 239 N.E.2d 654 (1968).

There is no doubt that Littell in good faith had strong reservations about Buckley's journalistic tactics in denouncing various individuals. But the fact still remains that what was said in *Wild Tongues* exceeded by a substantial distance what Littell actually believed. The passage in *Wild Tongues* makes an emphatic reference to Westbrook Pegler and to how he "lied day after day in his column". Littell now concedes that he did not believe that Buckley engaged in this type of activity.

The following testimony sums it up:

"Q All right. Now, did you intend to say, referring to this Westbrook Pegler reference, did you mean to say that Mr. Buckley lied day after day about any individual?

A I don't think he did.

THE COURT: You what?

THE WITNESS: I don't think he did."

Littell now concedes that what he said in *Wild Tongues* on this point was "infelicitous".

*Conclusion Regarding Littell's Belief*

For the reasons set forth above, I find that certain statements in *Wild Tongues* regarding Buckley were made by Littell with knowledge of their falsity, or in reckless disregard of whether they were true or false, and that this has been demonstrated with convincing clarity. The statements I am referring to are, of course, those which I have discussed— *i. e.*, that Buckley is a fellow traveler of fascism, as these terms are defined in *Wild Tongues;* that Buckley acts as a deceiver and uses his journalistic position to spread materials from openly fascist journals; and that Buckley engages in libelous journalism against individuals.

There are certain other statements in the "Fellow Traveler" passage of *Wild Tongues* which Buckley contends are false and exaggerated. These include the reference to Buckley's book *God and Man at Yale* being condemned by alumni and others, and the statement that Buckley has been caught at misquotation. In my view, such statements do not in and of themselves constitute libelous material. Nor would a discussion of these points add anything of substance to what has already been

said about the really serious parts of the "Fellow Traveler" passage.

### The Law of Libel

It is conceded that the state law of libel of New York governs this case, except to the extent that it is modified or limited by federal constitutional standards.

▉ Under New York law, a writing is libelous *per se* if it tends to expose a person to hatred, contempt or aversion, or to induce an evil opinion of him in the community. Mencher v. Chelsey, 297 N.Y. 94, 100, 75 N.E.2d 257 (1947). A writing is also libelous *per se* if it tends to injure a person in his professional capacity. November v. Time, Inc., 13 N.Y.2d 175, 244 N.Y.S.2d 309, 194 N.E.2d 126 (1963). The rules regarding damages will be discussed later in this opinion, but it should be said at this point that the basic effect of holding a writing to be libelous *per se* is that a judgment may be had without proof of "special damages". The Supreme Court has recently announced certain First Amendment limitations on libel damages. Gertz v. Robert Welch, Inc., 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974). To the extent relevant, this subject will be discussed later in this opinion.

Our attention has been called to no case which specifically holds that it is libelous to call a person a fascist or a fascist fellow traveler. However, there are cases in New York holding that it is libelous *per se* to accuse a person of being a Communist, a Communist sympathizer, or a fellow traveler of Communism. Toomey v. Farley, 2 N.Y.2d 71, 156 N.Y.S.2d 840, 138 N.E.2d 221 (1956); Mencher v. Chelsey, 297 N.Y. 94 (1947); Pauling v. National Review, Inc., *supra*.

The court of appeals for this circuit has thus interpreted New York law. Grant v. Reader's Digest Ass'n., Inc., 151 F.2d 733 (2d Cir. 1945), cert. denied, 326 U.S. 797, 66 S.Ct. 492, 99 L. Ed. 485 (1946). In the latter case Judge Learned Hand stated, after discussing various New York decisions (151 F.2d at 735):

> "Being the last decision of the state courts, it is conclusive upon us, unless there is a difference between saying that a man is a Communist and saying that he is an agent for the Party or sympathizes with its objects and methods. Any difference is one of degree only: those who would take it ill of a lawyer that he was a member of the Party, might no doubt take it less so if he were only what is called a 'fellow-traveler'; but, since the basis for the reproach ordinarily lies in some supposed threat to our institutions, those who fear that threat are not likely to believe that it is limited to party members. Indeed, it is not uncommon for them to feel less concern at avowed propaganda than at what they regard as the insidious spread of the dreaded doctrines by those who only dally and coquette with them, and have not the courage openly to proclaim themselves."

▉ In my view, the rationale of these decisions dictates a holding that the "Fellow Traveler" passage in *Wild Tongues* is libelous *per se* as to Buckley. It goes without saying that fascism is almost uniformly regarded in this country as something odious and totally contrary to our way of life and institutions. The concepts of fascism and fascist fellow traveling are described in *Wild Tongues* in elaborate detail to indicate the variety of evils connected with them, considerable emphasis being placed on the threat of conspiracy and subversion. Moreover, there is no question that Buckley's professional capacity as a journalist is subjected to a scurrilous attack in *Wild Tongues*.

### Application of First Amendment Decisions

It is well known that beginning with New York Times Co. v. Sullivan, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964), the Supreme Court has enunciated certain limitations upon state libel

laws, in order to prevent undue infringement of the First Amendment right of free speech. A thorough discussion of the way the *New York Times Co. v. Sullivan* rule has been developed in the various Supreme Court decisions is set forth in Justice Powell's opinion for the majority of the Court in Gertz v. Robert Welch, Inc., 418 U.S. 323, 334–39, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974).

A "public figure" such as Buckley, in order to recover in a libel action, must prove with convincing clarity that the alleged libelous statement was made with knowledge of its falsity or with reckless disregard for the truth or falsity of the statement. On the basis of my analysis of the facts of this case, I have already held that Buckley has sustained his burden of proof in this regard as to the statements made about him by Littell in *Wild Tongues*.

▉ There are certain points which require further discussion in dealing with the rules announced in the Supreme Court decisions. In the first place, I am acutely aware that the subject matter in *Wild Tongues* relates to political debate and that any restrictions upon such debate are looked upon with extreme caution. The Supreme Court in New York Times Co. v. Sullivan stated (376 U.S. at 270, 84 S.Ct. at 721):

> "Thus we consider this case against the background of a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open, and that it may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials."

However, the Supreme Court has made it clear that even in the area of political debate and discussion, there must be a recognition at some point of the interest of the individual in protecting his reputation against libelous falsehoods. This protection is accorded even to prominent public officials and other public figures, who have exposed themselves to the sharpest public scrutiny and criticism. The Supreme Court has stated in Garrison v. Louisiana, 379 U.S. 64, 75, 85 S.Ct. 209, 216, 13 L.Ed.2d 125 (1964):

> "Hence the knowingly false statement and the false statement made with reckless disregard of the truth, do not enjoy constitutional protection."

*See also* Goldwater v. Ginzberg, 414 F.2d 324 (2d Cir. 1969), cert. denied, 396 U.S. 1049, 90 S.Ct. 701, 24 L.Ed.2d 695 (1970). It is clear that there is no absolute and unconditional privilege against libel in the realm of political discussion any more than in any other area. Gertz v. Robert Welch, Inc., 418 U.S. 323, 341, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974).

Another question requiring discussion is whether the passage in *Wild Tongues* about Buckley is nonactionable because it deals with opinion, rather than with matters of fact. A related question is raised by Littell's defense of "fair comment".[7]

The defense of fair comment under New York law has been described in Julian v. American Business Consultants, 2 N.Y.2d 1, 155 N.Y.S.2d 1, 137 N.E.2d 1 (1956), where the New York Court of Appeals affirmed a dismissal of a libel action, involving statements about plaintiff's affiliation with a Communist organization. The court stated (2 N.Y.2d at 9, 155 N.Y.S.2d at 9, 137 N.E.2d at 6):

> "Under the rule of fair comment even if the publication holds one up to public ridicule, contempt and reproach or prejudices one in his opportunity

---

7. Macmillan originally asserted two other defenses—privilege of reply and the theory that Buckley had already disclosed the defamatory material in his own publications. Littell has not pressed these defenses. In any event, there is no evidence to support them.

to earn a living, nevertheless it is not actionable if facts form a reasonable basis of inference."

 The Supreme Court has provided the following formulation of the rule about fair comment, which would apply in a libel action by a public official or a public figure. The Court stated in New York Times Co. v. Sullivan, 376 U.S. 254, 292 n. 30, 84 S.Ct. 710, 732, 11 L.Ed.2d 686 (1964):

"Since the Fourteenth Amendment requires recognition of the conditional privilege for honest misstatements of fact, it follows that a defense of fair comment must be afforded for honest expression of opinion based upon privileged, as well as true, statements of fact. Both defenses are of course defeasible if the public official proves actual malice, . . ."

It is clear that when the Court speaks of "honest expression of opinion based upon privileged . . . statements of fact", the Court is speaking of opinions based upon facts "privileged" in the sense that there has not been proof of knowing falsity or reckless disregard for the truth, under the constitutional standard.

In considering the question of whether the statements in *Wild Tongues* about Buckley are protected opinions, it is necessary to bear in mind the following:

"Under the First Amendment there is no such thing as a false idea. However pernicious an opinion may seem, we depend for its correction not on the conscience of judges and juries but on the competition of other ideas. But there is no constitutional value in false statements of fact. Neither the intentional lie nor the careless error materially advances society's interest in 'uninhibited, robust, and wide-open' debate on public issues." Gertz v. Robert Welch, Inc., 418 U.S. at 339–40, 94 S.Ct. at 3007.

 The boundary line between "fact" and "opinion" is obviously not a precise one. To call someone a fascist fellow traveler is perhaps not as concrete a statement of fact as to say that someone committed a theft, or did some other similar deed. On the other hand, when Littell speaks of Buckley as a fellow traveler of fascism, indicating that he sympathizes with and promotes conspiracy and subversion, and when Littell accuses Buckley of deceptive and improper journalistic practices—we are surely dealing with questions of fact, and not merely ideas. To the extent that Littell's statements may represent conclusions or opinions, for the reasons I have discussed in detail, I must hold that they were not an "honest expression of opinion based upon privileged . . . statements of fact."

Another question to be dealt with is whether recovery should be denied on the theory that the language used by Littell about Buckley was mere "rhetoric" or "epithet". In Letter Carriers v. Austin, 418 U.S. 264, 94 S.Ct. 2770, 41 L.Ed.2d 745 (1974), the Supreme Court held that the New York Times Co. v. Sullivan standard was applicable under federal labor law to a particular type of labor controversy. The Court held that libel recovery was barred in a situation where the plaintiffs, who had refused to join a union, were called "scabs" and where a well-known, and highly inflammatory, piece of trade union literature by Jack London had been circulated in order to define what a scab was. The Court held that there was no reckless or knowing falsehood since the application of the word scab to plaintiffs was literally true, under a dictionary definition. Moreover, the Court held that the mere use of undefined slogans, or the use of words in a loose figurative sense, would not be actionable in the arena of labor debate. The Court stated (418 U.S. at 284, 94 S.Ct. at 2781):

"As the Court said long before *Linn*, in reversing a state court injunction of union picketing, 'to use loose language or undefined slogans that are

part of the conventional give-and-take in our economic and political controversies—like "unfair" or "fascist"— is not to falsify facts.' Cafeteria Employees Local 302 v. Angelos, 320 U.S. 293, 295 [64 S.Ct. 126, 127, 88 L.Ed. 58] (1943). Such words were obviously used here in a loose, figurative sense to demonstrate the union's strong disagreement with the views of those workers who oppose unionization. Expression of such an opinion, even in the most pejorative terms, is protected under federal labor law."

In Greenbelt Cooperative Publishing Association v. Bresler, 398 U.S. 6, 90 S. Ct. 1537, 26 L.Ed.2d 6 (1970), the Court held that there could be no recovery based on the use of the word "blackmail" because it was clear from the context that the word was no more than "rhetorical hyperbole, a vigorous epithet" and did not indeed charge the crime of blackmail (398 U.S. at 14, 90 S.Ct. 1537).

But the Supreme Court has clearly indicated that if rhetorical terms are used in such a way as to convey a false representation of fact, such words may be actionable. Letter Carriers v. Austin, 418 U.S. at 286, 94 S.Ct. 2770.

For reasons which have already been amply described, this case involves far more than mere rhetoric or loose, undefined slogans or epithets. *Wild Tongues* makes the elaborately defined and deliberate misstatements of fact which are actionable.

One final point relates to the question of the degree of difference between what Littell believed and what he said in *Wild Tongues* about Buckley. It would seem clear that under certain circumstances, one might find a difference between an alleged libelous statement and the belief held by the maker of the statement which would be too narrow to justify a holding that the statement was made with knowing falsity or in reckless disregard of the truth. In a given case, the differ-

ence might involve a mere problem of semantics, an innocent exaggeration, or "errors of interpretation or judgment" as was the case in Time, Inc. v. Pape, 401 U.S. 279, 290, 91 S.Ct. 633, 28 L.Ed. 2d 45 (1971). I have analyzed the record in this case to determine whether we have such a situation here. My conclusion is definitely to the contrary. For the reasons which I have already described, it is my view that the statements about Buckley in *Wild Tongues,* taken in their totality, make accusations against Buckley which are substantially and importantly different from what Littell actually believed. To ignore the sinister connotations of fascism and fellow traveling as defined in *Wild Tongues,* and to ride over the distinction between those concepts and something substantially less dangerous such as the "radical right", would be to close our eyes to matters which the parties to this action, including Littell, agree have important significance.

### Damages

Under New York law, damages in a libel action fall into two categories —compensatory and punitive. Faulk v. Aware, Inc., 35 Misc.2d 302, 231 N.Y.S. 2d 270, 274 (Sup.Ct. N.Y.County 1962). Compensatory damages fall into three subcategories—nominal damages, general damages and special damages. Restatement of Torts §§ 620–623 (1938); 1 Harper and James, The Law of Torts, 468–73 (1956).

The Supreme Court has held, in a case dealing with a person other than a public official or a public figure, that "presumed damages" (where no proof of actual injury is shown) and punitive damages, cannot be recovered in the absence of a showing of knowledge of falsity or reckless disregard for the truth, within the meaning of New York Times Co. v. Sullivan. Gertz v. Robert Welch Co., Inc., 418 U.S. 323, 349–50, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974).

**945**

However, in the case of a public figure, proof of knowing falsehood or reckless disregard for the truth is necessary in order to establish liability in a libel action. It follows that there is no constitutional bar in this situation to the recovery of presumed and punitive damages. See Curtis Publishing Co. v. Butts, 388 U.S. 130, 138, 159–61, 87 S. Ct. 1975, 18 L.Ed.2d 1094 (1967); Goldwater v. Ginzburg, 414 F.2d 324, 340 (2d Cir. 1969), cert. denied, 396 U.S. 1049, 90 S.Ct. 918, 25 L.Ed.2d 103 (1970).

With regard to compensatory damages, there has been no showing by Buckley of any actual injury occurring as a result of *Wild Tongues*. There is no evidence whatever to indicate any actual diminution in Buckley's standing with the public or in the journalistic world. This would preclude any award of special damages.

"General damages" can be awarded where, in spite of a failure to prove special or actual damages, there is sufficient evidence to permit an inference of some general impairment to the plaintiff's reputation or to his other interests. Restatement of Torts § 621. However, the evidence is not such as to permit even a finding of such general damages.

I find it appropriate to award nominal damages only, plus punitive damages as will be described shortly. The Harper and James treatise describes the basis for the award of nominal damages, and the description applies to the present case (Vol. 1, p. 468):

"The law 'presumes' some damage to reputation from the defamation itself. Moreover, the action for defamation performs a vindicatory function which, when the plaintiff is unable to prove damage and the circumstances are such that the jury is unwilling to infer actual damages in fact, can be attained only by the allowance of nominal dam-

ages. Accordingly, if the plaintiff shows the publication of language which is actionable per se, it is not necessary for him to prove any damages at all."

It should be noted that in both Reynolds v. Pegler, supra and Goldwater v. Ginzburg, supra the juries awarded nominal damages of $1.00 under the compensatory heading, prior to awarding punitive damages.

Under the New York law, punitive damages may be awarded where the publication is activated by a desire to harm the plaintiff, or where the publication is so recklessly made as to indicate a heedless disregard for the rights of others. Clevenger v. Baker Voorhis & Co., 19 A.D.2d 340, 243 N.Y.S.2d 231, 232 (1st Dept. 1963), aff'd 14 N.Y.2d 536, 248 N.Y.S.2d 396 (1964). The purpose of punitive damages is to assist in protecting the plaintiff's reputation, and to protect against like abuse of other persons similarly situated. Goldwater v. Ginzburg, *supra* 414 F.2d at 341.

I hold that punitive damages in the present case are appropriate and justified. It is clear from all that I have said previously that Littell's statements about Buckley in *Wild Tongues* were at least made with reckless disregard of the effects upon Buckley. My award of punitive damages is in the sum of $7,500. Although this award is moderate in comparison with the awards in some cases, it is a substantial sum of money to an author such as Littell.

I decline to grant Buckley's request for attorneys' fees.

*Conclusion*

For the foregoing reasons, Buckley is entitled to judgment in the amount of compensatory damages of $1.00 and punitive damages of $7,500.

The Clerk is directed to enter judgment in accordance with this opinion.