William F. BUCKLEY, Jr., Appellee,

v.

Franklin H. LITTELL, Appellant.

No. 623, Docket 75–7358.

United States Court of Appeals, Second Circuit.

Argued March 30, 1976.

Decided June 30, 1976.

---

Melvin L. Wulf, American Civil Liberties Union, New York City (David A. Barrett, Joel M. Gora, New York City, of counsel), for appellant.

C. Dickerman Williams, New York City (Windels & Marx, J. Daniel Mahoney, New York City, of counsel), for appellee.

Before KAUFMAN, Chief Judge, and OAKES and GURFEIN, Circuit Judges.

OAKES, Circuit Judge:

This appeal is from a judgment for libel obtained by the public figure, William F. Buckley, Jr., against Franklin H. Littell for statements made in the latter's book entitled Wild Tongues. Judgment was rendered after trial by the United States District Court for the Southern District of New York, Thomas P. Griesa, *Judge*, without a jury, on the basis of three defamatory statements, in the sum of one dollar compensatory and $7,500 punitive damages. *See Buckley v. Littell*, 394 F.Supp. 918 (S.D. N.Y.1975). We reverse in part, affirm in part and reduce the punitive damages to $1,000.

Wild Tongues was published by The Mac-Millan Co. in 1969, on the subject of the threat of totalitarianism to American religion and politics. Subtitled "A Handbook of Social Pathology," it purports to be a timely study of political extremism—both of the radical right and left—though the greater part of its content is directed at extremism from the "radical right." Evidently the book was written primarily for laymen and not, as Dr. Littell's earlier books had been, for a scholarly audience. The jacket states that the author's purpose was to demonstrate how the "pathological style" may be recognized, whatever its posture in the body politic. While the book considers that "the most dangerous internal challenge to America comes from the fascist wing," Wild Tongues at 35, it also condemns the threat from the left, especially from the campus Communists and extremist-controlled civil rights and peace movements. Focusing on the right, it views the John Birch Society as a principal threat to America, together with its assorted "fronts," especially the "Church League of America." An underlying theme of the book is the threat to Christian citizenship posed by extremism and a subtheme, if not the principal theme, is to the effect that the greatest gift to the totalitarians is "religious and political indifference and apathy." Having outlined in general the intended purposes of the book, we set forth the paragraphs containing the alleged defamatory statements in the margin.[1]

1. The alleged defamatory paragraphs read as follows:

> Whisking about the edges of any totalitarian movement is the "fellow traveler," pirouetting into the whirlpool and out again as

It was stipulated below, 394 F.Supp. at 922, that appellee William F. Buckley, Jr., is a "public figure" as defined by the United States Supreme Court in *Curtis Publishing Co. v. Butts,* 388 U.S. 130, 87 S.Ct. 1975, 18 L.Ed.2d 1094 (1967), and more recently in *Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 342, 345, 94 S.Ct. 2997, 3009, 41 L.Ed.2d 789 (1974):

> Those who, by reason of the notoriety of their achievements or the vigor and success with which they seek the public's attention, are properly classed as public figures . . ..
>
> For the most part, those who attain this status have assumed roles of especial prominence in the affairs of society. Some occupy positions of such persuasive power and influence that they are deemed public figures for all purposes. More commonly, those classed as public figures have thrust themselves to the forefront of particular public controversies in order to influence the resolution of the issues involved. In either event, they invite attention and comment.

From the time Buckley first wrote his book God and Man at Yale he has inspired considerable comment and he has been much in the public eye, founding in 1955 and editing The National Review which in 1968–69 as a fortnightly had a circulation of about 100,-000 copies per issue and has an even larger circulation now. Since 1964 Buckley has been the author of a syndicated newspaper column, "On the Right," appearing three

the vortex draws more powerfully and then recedes. His role is as dangerous to social health and as important to building up totalitarian parties as the equally ambiguous figure of the pseudo-conservative. The fellow traveler to the Communists or fascists is a fascinating psychological study: fascination with brute force and its misuse plays an important rule. Students of communism have commented at length upon the party member's "psychology of the pawn"—his need to be misused and abused, to the destruction of his own personhood. The fellow traveler's responses are essentially feminine, registering the ambivalence of love and hate toward the master and mover.

The fellow traveler refuses to accept discipline and is therefore both used and despised by the party leaders. At the same time, he is dangerous to political movements and republican institutions of integrity, because he functions as a deceiver. He appears at times to be independent, but, when a major issue is at stake, he follows the party line.

Perhaps the most famous type in recent years was Von Ribbentrop, pseudo-intellectual and champagne salesman, who was of great use to the Nazi government in giving an aura of respectability to international policies which, without a debonair front, might have been recognized readily for what they were: simple thuggery.

In America, the outstanding representative of this function is William F. Buckley, Jr., editor of *The National Review* and perennial political candidate. Buckley got his start as a smart young "intellectual" by writing a book, *God and Man at Yale,* upon graduating from his *alma mater.* The book has been soundly exposed and condemned by professors and overseers and loyal alumni for falsely twisting facts and for sheer malice. *The National Review* and his syndicated newspaper column, "On the Right," frequently print "news items" and interpretations picked up from the openly fascist journals and have been important and useful agencies for radical right attacks on honest liberals and conservatives.

Buckley has been caught out for misquotations (with quotation marks!) and for repeating radical right malice and rumor, but he never admits a mistake or apologizes to the victims. Like Westbrook Pegler, who lied day after day in his column about Quentin Reynolds and goaded him into a lawsuit, Buckley could be taken to court by any one of several people who had enough money to hire competent legal counsel and nothing else to do. Reynolds won his suit, of course, but it took all of his time and resources for most of three years, and he died shortly thereafter.

They are immediately followed by:

As his lack of respect for the rules of the dialogue and his constant undermining of respect for American leadership and institutions reveal, Buckley is not a "conservative" at all. The streak of ideological taint and moral nihilism is too pronounced, even though he is probably not under the direct control of any subversive party. When he publicly criticized Robert Welch of the John Birch Society, Buckley did not do it because Welch led a fascist-type conspiracy and used immoral tactics to undermine the constitutional order. Buckley said Welch was too extreme to be successful. When Dr. Martin Luther King, Jr. was assassinated, Buckley wrote in his column a tortuously reasoned explanation that the murderer represented the error of an independent conscience, which was Dr. King's error too.

"Truth," asked Pilate, "What is truth?"

times weekly in 250 newspapers in 1968–69 and in about 350 newspapers today. Beyond this he has a weekly television show entitled "Firing Line," carried first by commercial television and subsequently by public broadcasting and radio. The evidence is that his column, "On the Right," was the third most widely-sold column of political commentary in 1968 and 1969 and is second only to Jack Anderson's column today. Buckley is a lecturer, the author of a number of books and articles, and was chairman and part owner of the Star Broadcasting group, which owns radio and television stations and a book publishing company. He was the unsuccessful Conservative Party candidate for mayor of New York in 1965 and served for three years on an advisory committee of the United States Information Agency; in 1973 he was a public member of the United States delegation to the 28th General Assembly of the United Nations. At one time he was also a candidate for the Yale University Board of Trustees. He is a frequent guest on television and radio programs and is recently a successful novelist. The substance of much of his writing and speaking is political. He may fairly be described as perhaps the leading advocate, idealogue or theoretician of conservative political beliefs and ideas. He is, in short, a public figure for all purposes and in the classic sense of the Supreme Court cases. *Cf. Time, Inc. v. Firestone*, 424 U.S. 448, 96 S.Ct. 958, 47 L.Ed.2d 154 (1976).

Appellant, Franklin H. Littell, is a theologian who has also been involved in public affairs. He was ordained a Methodist minister in 1941 and received a Ph.D. in church history from Yale in the same era as Buckley was graduating from that esteemed university. He was the chief Protestant advisor to the United States High Commissioner in Germany, principally engaged in "de-Nazification," in 1949–1951. Since then he has taught at a number of universities and theological schools, has been president of Iowa Wesleyan College, has preached and lectured throughout the United States and Europe, and presently is a professor at Temple University. He wrote the book Wild Tongues principally, he said, out of his

concern for the threat to democratic society posed by extremist groups and individuals and based upon his observation of the impact of communism in Eastern Europe and of his rather considerable experience in reference to the impact of fascism in Western Europe. The book was written following the assassinations of Dr. Martin Luther King, Jr., and Senator Robert F. Kennedy, which excited Dr. Littell's emotions as they did many others; the "wild tongues" of its title is taken from a stanza of Kipling's "Recessional" and refers to the "demagogues" who bring malice and confusion to political dialogue. *See* Wild Tongues at 118–19. Dr. Littell has given seminars on church struggles with totalitarianism, and is the author of 12 books on topics of religious liberty. In 1966 he became chairman of an organization called the Institute for American Democracy (IAD), a group founded for the purposes of opposition to political extremists. Following the formation of the IAD, both it and Littell were attacked beginning in January, 1967, in the John Birch Society Bulletin, in News and Views of the Church League of America, and in other conservative periodicals and broadcasts as well as by the National Review. At one point in 1967, Littell testified, his living room window was shot out and his family received threatening and obscene telephone calls. There were continued attacks upon him in News and Views in June 1968, in Buckley's column in July, 1968, and in News and Views in November, 1968, which was cited with approval in the National Review that month.

Littell's reference to Buckley in Wild Tongues grew, according to Littell's testimony, out of his observations of Buckley's politics beginning in the late 1950's, and more particularly out of a personal exchange with Buckley which involved a speech written by Littell for delivery to the National Education Association in 1967 on the subject of left and right extremism. The National Review's Bulletin carried a report of the speech on August 15, 1967, as an attack on the right wing, purporting to quote Littell but using, as it turned out, an

inaccurate Rocky Mountain News report of the speech for its direct quotations. In November 1967, Littell wrote to Buckley, complaining of misquotation in the Bulletin and enclosing a copy of his speech for comparison, adding that he appreciated Buckley's "effort to maintain an honest and non-Fascist Conservatism," and therefore expected him to check his sources. When Buckley informed Littell on January 8, 1968, that he was preparing a column involving Littell's speech, Littell wrote again on January 14 to explain his protest of the report of his speech and asked for a correction in these terms:

> . . . I had considered you and your journal a considerable cut above [the extremists of Left and Right]. Sometimes your comments reveal ideological taint, but this is a very general malaise today, even among decent people. I have taken pains in response to questions in public lectures to distinguish your work from that of the Fascist, and I think if you are truly a Conservative I think you will agree that I am entitled to the same trouble.

The "trouble" Buckley gave Littell appeared in his column "On the Right" on February 10, 1968, under the title "Who Are the Totalitarians?" Buckley admitted at trial that he referred to Littell's speech with inaccurate direct quotations labeling Robert Welch and Gerald L. K. Smith part of the "fascist underworld." The substance of Buckley's criticism of Littell's argument for suppression of political extremism was reflected in his queries, "Where do you draw the line?" and "What does Dr. Littell mean by fascist?" Buckley termed Littell an "abusive rhetorician," and the IAD, the "successor" to the National Council for Civic Responsibility, a "phoney outfit" "commissioned to defame Senator Goldwater." After receiving another protest from Littell, calling Buckley a "smart aleck without principles," and a request for a correction from the Executive Secretary of IAD which was denied, Buckley published excerpts of the Buckley-Littell correspondence in the March 12, 1968, issue of the National Review without Littell's knowledge. It was in the context of this strongly-worded interchange, as well as the continuing criticism of Littell and the IAD in the National Review, that the reference to Buckley in Wild Tongues came about, see note 1, supra.

As we read Judge Griesa's extensive opinion he found that the passage set forth in note 1, supra libeled Buckley in three respects: first, by labeling Buckley as a "fellow traveler" of "fascism" as those terms are defined in Wild Tongues, see 394 F.Supp. at 924–25, 929, 940; second, by saying that he acts as a "deceiver" and uses his journalistic position to spread materials from "openly fascist journals" under the guise of responsible conservatism, see id. at 929, 933–34, 940; and third, by accusing Buckley of engaging in the same kind of libelous journalism as Westbrook Pegler practiced against Quentin Reynolds.[2] See id. at 924–25, 929, 939–40. The district judge's extensive exegesis of the book in question may be summarized by the statement that he interpreted the passage regarding Buckley, taken in context with other portions of the book, as labeling Buckley as the outstanding representative in this country of the function of fascist fellow traveler, associated with clearly specified evils which the court found to include "disloyalty to the government of this country, advocacy of conspiratorial overthrow of the government, devotion to violence and disruptive tactics for the subversion of our institutions, including churches." Id. at 929.

The court held that the three libelous statements were made "with knowledge of their falsity or in reckless disregard of whether they were true or false," a proposition which it found had been demonstrated "with convincing clarity," id. at 940, primarily by Littell's own testimony of his opinions and intentions recounted at considerable length in the opinion, id. at 932–

---

2. See Reynolds v. Pegler, 223 F.2d 429 (2d Cir.), cert. denied, 350 U.S. 846, 76 S.Ct. 80, 100 L.Ed. 754 (1955).

34, 936–40. The court took the view that it was evident from the testimony that there are "substantial differences between what the book states and what Littell in fact believed." *Id.* at 932.

The common law of libel relied upon by the court below as set forth in the New York cases was that courts will not strain to interpret commentary in its mildest and most inoffensive sense. *Mencher v. Chesley,* 297 N.Y. 94, 99, 75 N.E.2d 257, 259 (1947). The test applied to determine whether a passage is libelous was rather what the overall effect would be upon an ordinary reader. *Everett v. Gross,* 22 App. Div.2d 257, 254 N.Y.S.2d 561 (1st Dep't 1964). Since those cases were decided, however, *New York Times Co. v. Sullivan,* 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964), and many Supreme Court cases following it have recognized that the law of defamation is one which has enormous First Amendment implications and which may constitute an intrusion upon the prohibitions of that amendment. The law of defamation has in effect been rewritten in the light of the constitutional imperatives.[3] *See* Restatement (Second) of Torts, Special Note at 3 (Tent. Draft No. 21, 1975).

■ As to our role in reviewing a libel case, the First Amendment requires careful appellate review of the facts found at trial which have constitutional significance. As the Court said in *New York Times Co. v. Sullivan, supra* :

[T]he rule is that we "examine for ourselves the statements in issue and the circumstances under which they were made to see . . . whether they are of a character which the principles of the First Amendment . . . protect." [Citations omit-

ted.] We must "make an independent examination of the whole record" . . . so as to assure ourselves that the judgment does not constitute a forbidden intrusion on the field of free expression.

376 U.S. at 285, 84 S.Ct. at 728. *See also, e. g., Time, Inc. v. Pape,* 401 U.S. 279, 284, 91 S.Ct. 633, 28 L.Ed.2d 45 (1971); *Fiske v. Kansas,* 274 U.S. 380, 385–86, 47 S.Ct. 655, 71 L.Ed. 1108 (1927). It may be true that, as a general rule, we are permitted only to review findings of fact under the "clearly erroneous" standard when the factfinder is a judge. 9 C. Wright & A. Miller, Federal Practice and Procedure § 2585, at 730–31, 734 (1971). But when interpretation of a communication in the light of the constitutional requirements is involved, our scope of review is to examine in depth the "statements in issue" and the "circumstances in which they are made." *See New York Times Co. v. Sullivan, supra,* 376 U.S. at 285 n.26, 84 S.Ct. 710; *Davis v. Schuchat,* 510 F.2d 731, 735–36 (D.C.Cir. 1975); *Goldwater v. Ginzburg,* 414 F.2d 324 (2d Cir. 1969), *cert. denied,* 396 U.S. 1049, 90 S.Ct. 701, 24 L.Ed.2d 695 (1970). It is our duty to "re-examine the evidentiary basis" of the lower court decision, *Time, Inc. v. Pape, supra,* 401 U.S. at 284, 91 S.Ct. 633, in the light of the Constitution.

■ Before undertaking such review, however, we may say parenthetically that we reject appellant's suggestion that somehow Buckley is "libel-proof," the suggestion being based on our decision in *Cardillo v. Doubleday & Co.,* 518 F.2d 638 (2d Cir. 1975), where we held that an habitual criminal could not recover in a libel action based upon references to him in a book about the Mafia. Mr. Buckley, despite the fact that

---

**3.** *See* Eaton, *The American Law of Defamation Through Gertz v. Welch, Inc. and Beyond: An Analytical Primer,* 61 Va.L.Rev. 1349, 1364 et seq. (1975); Robertson, *Defamation and the First Amendment: In Praise of Gertz v. Robert Welch, Inc.,* 54 U.Tex.L.Rev. 199 (1976). For one of the early recognitions of the transmutation of the law of defamation into a subject of constitutional imperatives *see* Kalven, *The New York Times Case: A Note on the Central Meaning of the First Amendment,* 1964, S.Ct. Rev. 191.

The district court, unfortunately, did not approach the task of interpreting the debatable meaning of the alleged libels in the light of the imperatives of "uninhibited, robust, and wide-open" debate, *New York Times Co. v. Sullivan,* 376 U.S. 254, 271, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964), but only discussed their implications once its search for the "proper interpretation" of Wild Tongues had ended. 394 F.Supp. at 925, 929, 931, 942.

he has spent a life in politics as a principal spokesman for a controversial political position and is eminently prominent, obviously may be the target of libel; his reputation, however capable he may be of answering false and defamatory attack with the communications resources at his command, is nevertheless one that could suffer under the onus of defamation. The victims of the era of McCarthyism who had occupied positions of prominence in the radio, television and cinema fields are ample proof of that. The doctrine of "libel-proof" defendants that our *Cardillo* case enunciated is a limited, narrow one, which we will leave confined to its basic factual context.

When we confront the constitutional law of libel, it is at once evident, as set forth first in *New York Times Co. v. Sullivan, supra,* that our primary concern must be the "profound national commitment to the principle that debate on public issues should be uninhibited, robust and wide open and that it may well include vehement, caustic and sometimes unpleasantly sharp attacks . . .." 376 U.S. at 270, 84 S.Ct. at 721. From this premise proceeds the conclusion, made explicit in *Gertz v. Robert Welch, Inc., supra,* that "[u]nder the First Amendment there is no such thing as a false idea. However pernicious an opinion may seem, we depend for its correction not on the conscience of judges and juries but on the competition of other ideas." 418 U.S. at 339–40, 94 S.Ct. at 3007. Our Constitution thus contemplates a bias toward unfettered speech at the expense, perhaps, of compensation for harm to reputation, at least where a public figure and a topic of enormous public interest, going to the heart of political discourse, is concerned. *Id.* at 339–43, 94 S.Ct. 2997. *See generally Ocala Star-Banner Co. v. Damron,* 401 U.S. 295, 300–01, 91 S.Ct. 628, 28 L.Ed.2d 57 (1971); *id.* at 301 (White, *J.,* concurring); *Time, Inc. v. Pape, supra,* 401 U.S. at 290–92, 91 S.Ct. 633; *Monitor Patriot Co. v. Roy,* 401 U.S. 265, 274–77, 91 S.Ct. 621, 28 L.Ed.2d 35 (1971); *Greenbelt Cooperative Publishing Ass'n v. Bresler,* 398 U.S. 6, 11–12, 90 S.Ct. 1537, 26 L.Ed.2d 6 (1970); *St. Amant v. Thompson,* 390 U.S. 727, 731–

33 (1968); *Beckley Newspapers Corp. v. Hanks,* 389 U.S. 81, 82–85, 88 S.Ct. 197, 19 L.Ed.2d 248 (1967); *Curtis Publishing Co. v. Butts, supra,* 388 U.S. at 146–53, 87 S.Ct. 1975, 18 L.Ed.2d 1094; *Rosenblatt v. Baer,* 383 U.S. 75, 79–86, 86 S.Ct. 669, 15 L.Ed.2d 597 (1966). Here involved is an exchange, however heated, about systems of government, about democracy and totalitarianism and about the continuation of the freedom of religious worship; surely these are matters where the widest latitude for debate in the interests of the First Amendment must be furnished. As was said in *Cantwell v. Connecticut,* 310 U.S. 295, 310, 60 S.Ct. 900, 84 L.Ed. 1213 (1940), *quoted in New York Times Co. v. Sullivan, supra,* 376 U.S. at 271, 84 S.Ct. at 721:

> In the realm of religious faith, and in that of political belief, sharp differences arise. In both fields the tenets of one man may seem the rankest error to his neighbor. To persuade others to his own point of view, the pleader, as we know, at times, resorts to exaggeration, to vilification of men who have been, or are, prominent in church or state, and even to false statement.

Hence mere falsity and defamation is not enough. There must be "actual malice," as that term has been constitutionally defined, to permit recovery in this area, affecting as it does "the essence of self-government." *Garrison v. Louisiana,* 379 U.S. 64, 74–75, 85 S.Ct. 209, 13 L.Ed.2d 125 (1964). Repeatedly the Court has said that ill will toward the plaintiff or bad motive, indeed, hatred, spite or desire to injure, are not the kind of "malice" that the *New York Times Co. v. Sullivan* test comprehends. *National Association of Letter Carriers v. Austin,* 418 U.S. 264, 281, 94 S.Ct. 2770, 41 L.Ed.2d 745 (1974); *Rosenblum v. Metromedia, Inc.,* 403 U.S. 29, 52 n.18, 91 S.Ct. 1811, 29 L.Ed.2d 296 (1971) (opinion of Brennan, *J.*); *Greenbelt Cooperative Publishing Ass'n v. Bresler, supra,* 398 U.S. at 9–11, 90 S.Ct. 1537, 26 L.Ed.2d 6. The appellee, a public figure, must rather have demonstrated with convincing clarity not only that the appellant's statements were false, but that appellant knew they were false or made them

with reckless disregard of their truth or falsity. *Gertz v. Robert Welch, Inc., supra,* 418 U.S. at 342, 94 S.Ct. 2997; *New York Times Co. v. Sullivan, supra,* 376 U.S. at 279–80, 285–86, 84 S.Ct. 710. But the interpretation of what is libelous must also be measured very carefully because, as Mr. Justice Harlan said in *Curtis Publishing Co. v. Butts, supra,* 388 U.S. at 155, 87 S.Ct. 1975, 18 L.Ed.2d 1094, public officials and public figures have "sufficient access to the means of counter-argument to be able 'to expose through discussion the falsehood and fallacies' of the defamatory statements." This principle was expounded and reinforced in *Gertz, supra,* 418 U.S. at 344, 84 S.Ct. 710.

We will examine each of the three alleged libels separately in light of these First Amendment imperatives.

The first is that Buckley is a fellow traveler of fascism as those terms, "fellow traveler" and "fascism," are defined in *Wild*

Tongues. The judge's view of the book was that "[i]t is clear that Buckley is charged with being a fellow traveler of the fascists." 394 F.Supp. at 925. But the book does *not* say this; this is an interpretation of the passage which is possible, but it is only one interpretation. Parenthetically it was also essentially Buckley's own interpretation [4] that the court drew from him in response to a series of questions. Another interpretation is, of course, the appellant's given at trial that what he was really attempting to say was that Buckley was a fellow traveler of the "radical right" or the "right wing." Both in Littell's colloquies with the court and within his own testimony he used the metaphor of Buckley's being a "rogue comet," one which did not follow a systematic pattern of astronomical behavior, but was "heavily in [the] magnetic orbit of the radical right." Buckley's and Littell's definitions of "fascism" clearly differed, as may be seen in their classifications of a variety of different organizations and periodicals.[5]

4. On appeal, appellee's brief goes quite a bit further than did appellee in his testimony and somewhat further than the court did in its opinion below by assimilating to the book's appellation of Buckley as a "fellow traveler" all of the evils associated with the Nazis: "totalitarianism, sadism and violence, the burning of synagogues, the defacement of Jewish buildings, the 'use of the knife,' etc." Brief for Appellee at 3, 10–20. The facial absurdity of this construction is heightened by the fact that the book, while viewing present danger to America to be greatest from the right, attacks generally both the radical right *and left* wings of the political spectrum, and considers both fascism *and* communism to be totalitarian: *e. g.,* "Right now the fascist international is a rather pitiful affair contrasted with the mortal threat posed by the Communist international, but the 'grid' [for detecting totalitarian movements] does not require as much adjustment at this point as some suppose." Wild Tongues at 91–92. Another example of the book's inclusion of communism as a threat appears at 102: "Demagoguery is just as common in leftist extremism as in rightist circles. Among the most blatant illustrations are the use made of the Rosenberg case in France and other foreign countries and the sloganizing protests against American policy in Southeast Asia in many European areas." These are not just passing references. The book condemns the SDS and the "new left" at 28–35.

Appellee's brief goes even further at 17 in quoting from Wild Tongues at 36 with empha-

sis added to suggest that the book refers to a fellow traveler as one whose "style is conspiracy and his stench is disloyalty"; in fact the phrase in context is referring to "the totalitarian demagogue," which is clearly meant to be a different figure from the fellow-traveling pseudo-conservative who is his "patsy." Again, the appellee's brief at 30 misquotes appellant's brief by saying "Indeed, as already noted, defendant formally admits in his brief that 'he did not believe that what he said was true as regards the allegation that Buckley was a fellow traveler of fascism.'" In fact, appellant's brief at 13, correctly quoted theretofore in appellee's brief in the note, at 4, says: "Littell testified that he did not believe Buckley was a fellow traveler of fascism and that he never intended to say that in Wild Tongues."

5. Buckley testified that he considered that H. L. Hunt's Life Line, Edgar Bundy's News and Views, Frank Capell's Herald of Freedom, the John Birch Society, and Billy James Hargis, among other journals, groups and figures, to be non-fascist, while Littell testified that he considered these three periodicals, plus the John Birch Society's Bulletin and Hargis's Churchmanship and Politics to be "openly fascist journals," as the phrase was used in Wild Tongues, note 1, *supra.* It should be noted that no listing of fascist journals was made in the book and that three of the seven "openly fascist journals" identified by Littell at trial were listed in Wild Tongues as periodicals of the "Radical Right." Appendix 2, at 134–35.

The book itself appears at one point to equate the "radical right" and "fascism," [6] and Buckley himself testified that Littell uses the term "radical right" in his speech and writings "pretty much indiscriminately with the word 'fascist.'" We know of no requirement that Littell is bound to appellee's own rather loose definitions of the terms, or to Buckley's differentiation between them.[7]

Beyond the ambiguity and looseness of the terms "fascist" and "radical right," the usage of the term "fellow traveler" in Wild Tongues, including the reference in the allegedly libelous passage, note 1, *supra,* is equally consistent with the appellant's in-

6. Wild Tongues, at 60, states:
> So too with the term "radical right," the phrase is preferred by some writers who do not want to apply the precise rubric, which is fascism. . . . "Fascism" is the term to apply to parallel movements and systems today, even though specialists note technical differences between Italian fascism, German Nazism, Spanish Falangism, and other radical right movements.

It should appear that this does not necessarily mean that for all purposes Littell equates the terms "radical right" and "fascism"; it is altogether possible that he meant that "some writers" use the lesser term "radical right" to refer to the greater evil, "fascism." In the exact context of the purported equation Littell points out, not without some historical justification, that "[t]he issue in the rise of Communist—and fascist-type parties is precisely that the ill-trained and half-formed baptized tend to be swept away, whereas genuine 'confessing Christians' would stand fast to the truth." Id. Viewed more charitably, as the Constitution requires, the overall passage may be interpreted to mean that the "radical right" may tend to be subsumed in "fascism" as a particular movement takes shape.

7. When Buckley was asked to define "fascist," he stated:
> My definition of fascist is a movement that developed in the 20th century around Mussolini, the purpose of which was to organize society with reference to certain corporate objectives, and in the course of doing so to subordinate the judiciary and the legislature to the executive and to repeal any human rights to the extent that they stand in the way of the rights of the corporate state.
>
> Q. Other [sic] have different definition of the term fascist; isn't that correct?
>
> A. Well, if you are saying the people use terms incorrectly, the answer is yes.

We may note that this definition, however "correct" it may be, is significantly more nar-

The only journal agreed upon by both Buckley and Littell to be "fascist" was The Cross and the Flag. In addition to giving a non-fascist rating to some of Littell's fascist-rated materials, Buckley came up with some "fascist" rated journals which had not been so rated by Littell, namely, The Washington Observer, as "fascist in tone," and the Minutemen's On Target.

row than the dictionary definition, the several accepted variations of which include at least one meaning which is extremely broad.
> fascist . . . 1. *often cap:* the principles of the Fascisti; *also:* the movement or governmental regime embodying their principles. 2a: any program for setting up a centralized autocratic national regime with severely nationalistic policies, exercise regimentation of industry, commerce, and finance, rigid censorship, and forcible suppression of opposition. b: *any tendency toward* or actual exercise of severe autocratic or dictatorial control (as over others within an organization) . . ..

Webster's Third New International Dictionary at 825 (1971 ed.) (emphasis added).

When asked to define and describe "radical right" Buckley testified:
> The word radical right is mostly used in a pejorative context in an attempt to distinguish that part of the right which is uninhibited by any sense of decency, any sense of restraint, any requirement to acknowledge distinctions. It is used most generally in that sense.
>
> \* \* \* \* \* \*
>
> "[R]adical right" as generally used is a term of opprobrium, seeking to characterize that part of the "right" which specializes in the nonmaking of distinctions in passionate and thoughtless and abusive *and often fascistic proposals.*

(Emphasis added.) It appears that in Buckley's view the "radical right" may be characterized as those who often embrace fascist proposals. The looseness of the terminology is further demonstrated by the court's question, later in the trial, "'Radical right' isn't as well defined as fascist is it?" and Buckley's definition a few moments later: "It's [the 'radical right' is] *mostly* understood as a way to designate irresponsible, thoughtless, sometimes racist organizations of right wing agitators." (Emphasis added.) The term "radical right," this exchange suggests, is rather imprecise since it can be defined even by appellee only in the way it is "mostly understood" and in terms of such generalities as "irresponsible," "thoughtless" or "sometimes racist," or only circularly as consisting of "right wing agitators." We should suppose that more than one person uses the term "fascist" equally loosely and so as to overlap "radical right."

terpretation of its connoting an innocent dupe as with the appellee's and the court's interpretation of a conscious political adherent.[8] Even the statement from the disputed passage, note 1, *supra,* that a fellow traveler "functions as a deceiver" is subject to the interpretation that the deception might be innocent and unintentional; one can "function as a deceiver" without doing so intentionally. The "fellow traveler," moreover, is said to refuse "to accept discipline and is therefore both used and despised" by party leaders and "appears at times to be independent," though when a major issue is at stake he follows the party line; again this is by no means to say that he intentionally follows the party line. It is true that in the paragraph preceding the reference to Mr. Buckley, there is a reference to Von Ribbentrop, the Nazi war criminal who had been a champagne salesman before he became first an ambassador and then foreign minister of the Nazis. While appellee's brief on appeal suggests that appellee was consequently likened to Von Rippentrop by direct analogy, even the district court opinion does not go so far. And to counter this to some extent, in the paragraph of Wild Tongues next following, *see* note 1, *supra,* Buckley is said to be "probably not under the direct control of any subversive party."

It can be seen, the moment that we are involved in ascertaining what meaning Littell's statement purport to convey, that we are in the area of opinion, as opposed to factual assertion. While Buckley said he himself had not used the word "fascism" in

15 years, he had, for example, referred once in a published reply to a review of God and Man at Yale by McGeorge Bundy by saying that the word "fascist" fitted "with unusual precision Mr. Bundy's advocacy of irresponsible, irreproachable education by an academic elite." While he took the occasion of the trial to repudiate that usage, it further pointed up the looseness of the term. He had used the word "totalitarianism" similarly loosely, he admitted, in the past; Buckley himself put it accurately by saying that "As you know, a totalitarian [sic] can under certain circumstances be used metaphorically." It is not without significance that the very title of his column dealing with Littell, "Who Are the Totalitarians?" (erroneously referred to on oral argument as "Who Are the Authoritarians"), implied in a way that Littell was a "totalitarian." Moreover, when asked if there existed other fascist journals in addition to that of the American Nazi Party, Buckley gave the word a varying content: "I would say that, depending on whether you vest in the word fascism the primary motivation of anti-Semitism then the answer is yes." He referred to the magazine Common Sense as "openly fascist insofar as it is clamorously anti-Semitic." Again, "I guess what I'm trying to say is that, depending on whom I was talking to, I would call it openly fascist or not, depending on the requirements of precision." *Compare* note 7, *supra.* In reply to a question of the court, Buckley added that the term "fascism" and the term "fellow traveler" had acquired a "loose meaning" but in no case a nonpejorative

8. For example, Wild Tongues, at 36, defines a "pseudo-conservative" as "the 'patsy,' the fellow traveler to the fascists." The "pseudo-conservative" at this same point is said to follow "the lead of the demagogues, with a frenzy of unrestrained attacks on public policy and a minimal offering of constructive alternative proposals," *id.,* to praise "police power and [treat] the rights of ordinary citizens with contempt." *Id.* at 37. If a "fellow traveler" is a "patsy," it may be that he has been misled, but it does not mean that he is an intentional conspirator. (The Harper Dictionary of Contemporary Usage (1975) defines "patsy" as a person who is "easily cheated, imposed upon, or otherwise victimized." It comes from the Ital-

ian "pazzo," meaning "fool" or "insane person.")

The district court relied on Littell's definition of "fellow traveling" in Appendix 2, at 131, of Wild Tongues as "to follow a 'line' fixed by someone else in another place, while pretending to integrity—and independence of discussion and decision," in accepting appellee's contention that a "fellow traveler" means one who consciously adheres to fascist principles. That this general definition in the appendix is arguably directly contradicted by usage of the term in the context of explicit examples of "fellow traveling" in the text at 36 and in the passage in dispute at 50, is not mentioned by the district court.

meaning.[9] Buckley proffered with a somewhat greater measure of precision his definition of the spectrum of conservative thought as follows:

> [T]he right and the left join, that the schematic is more accurately pictured as a circle. But popularly we have the notion that at one end you have right totalitarianism, of which Hitler was clearly the most obvious historical example, at the other end you would have the left totalitarian, the Stalin, and as you work from one to the other you traverse, beginning from Stalin, let us say, on over to democratic socialism, democratic socialism on over to a sort of pragmatic liberalism and from pragmatic liberalism to a sort of a pragmatic conservatism, from a pragmatic conservatism to a princip[led] conservatism, from a princip[led] conservatism on over to a sort of a neodespotism of the right, from there on over towards fascism, and from fascism on over towards naziism.

Necessarily such a spectrum and the place of a given commentator who takes a position in it involves to a significant extent an area of opinion.[10]

■ *Gertz v. Robert Welch, Inc., supra,* 418 U.S. at 339–40, 94 S.Ct. 2997, made the

distinction—crucial to the issue—between "false statements of fact" which receive no constitutional protection, and "ideas" and "opinions" which by definition can never be "false" so as to constitute false statements which are unprotected when made with actual malice. *See* Restatement (Second) of Torts, *supra,* § 566, comment *c* at 8–9. The district court recognized that the "boundary line" between fact and opinion is not a precise one, and acknowledged that "to call someone a fascist fellow traveler is perhaps not as concrete a statement of fact as to say that someone committed a theft. . . ." 394 F.Supp. at 943. Nevertheless the court found that

> [W]hen Littell speaks of Buckley as a fellow traveler of fascism, indicating that he sympathizes with and promotes conspiracy and subversion . . . we are surely dealing with questions of fact, and not merely ideas.

We find, to the contrary, that the use of "fascist," "fellow traveler" and "radical right" as political labels in Wild Tongues cannot be regarded as having been proved to be statements of fact, among other reasons, because of the tremendous imprecision of the meaning and usage of these terms in the realm of political debate, an imprecision which is simply echoed in the book.[11] This

---

**9.** Appellee himself was acutely aware of the element of opinion involved in such loose terminology. The following exchange occurred in cross-examination of him relative to his having called Littell an "abusive rhetorician," after he testified that he did so because "[t]o say . . . that [Edgar] Bundy [of the "Church .League of America"] is part of the fascist underworld simply is abusive":

> Q. But that's just your opinion, correct?
> A. What do you mean my opinion?
> Q. That he was abusive, that Dr. Littell's letter is abusive.
> A. Is there an opposite to an opinion in something like this? Is my opinion as distinguished from my what?
> Q. That's just your opinion. You can answer yes or no.
> A. No, I can't. You are playing rhetorical games with me and I choose not to submit. Do you mean is there a Bureau of Labor of Standards or FDA on the basis of one can measure what is abusive?

Again, in another context Buckley allowed that "there is a certain democracy in language and usage tends to dictate its meaning."

**10.** One interesting aspect of the trial was the district court's rather considerable reliance on the plaintiff's own definitions of such terms as "fellow traveler," "radical right," and "fascist." While the court of course recognized that it was accepting the definition as given from a particular point of view, it appears that in interpreting the allegedly libelous passage it did so to the exclusion of other definitions from a different point of view. And it did so without noting that even the comments of its single "expert," as the court in effect treated Buckley, indicated that the common understanding and usage of "fascist" and "radical right," let alone their meaning as interpreted from Wild Tongues, are matters of significant ambiguity.

**11.** It may be that the fundamental error of the district court was accepting Buckley's own narrow and hence somewhat more precise definition of fascism as involving both anti-Semitism and the use of force to take control of the government. *Compare* 394 F.Supp. 929–30 *with id.* at 933 & n. 5. Doing so the court was apparently led into acceptance of the proposition that the term "fascist" is not susceptible to

is not a case such as *Greenbelt Cooperative Publishing Ass'n v. Bresler, supra,* 398 U.S. at 22, 23, 90 S.Ct. 1537, relied on by the district court, 394 F.Supp. at 925, 944, where a word is used which has only two precisely articulable meanings. There, for example, the word "blackmail" was found in context to refer to hard or unfair bargaining rather than to an allegation of the commission of a punishable crime. The concept "fellow traveler" of "fascism" by contrast is referable to a whole range of meanings and characteristics, *see* notes 6, 7 and 8, *supra.* The search for the precisely articulable meaning of the statements about Buckley to the ordinary reader could only be, in a sense, an arbitrary one because of the ambiguous and sometimes even contradictory content of the terminology necessarily utilized in Littell's polemical tract.[12] This is not a case where a person is being accused of being a member of the Communist Party, or a legislative representative of the Communist Party, as in the New York cases relied upon by the district court, 394 F.Supp. at 941, all of which incidentally predate *New York Times Co. v. Sullivan, e. g., Toomey v. Farley,* 2 N.Y.2d 71, 156 N.Y.S.2d 840, 138 N.E.2d 221 (1956); *Grant v. Readers Digest Ass'n, Inc.,* 151 F.2d 733 (2d Cir. 1945) (Learned Hand, *J.*), *cert. denied,* 326 U.S. 797, 66 S.Ct. 492, 90 L.Ed. 485 (1946). Such allegations of membership or well-defined political affiliation are readily perceivable as allegations of fact susceptible to proof or disproof of falsity. They are quite dissimilar to the terms "fellow traveler," "fascism" and "radical right" which, whether as used by Littell or as perceived by a reader, are concepts whose content is so debatable, loose and varying, that they are insusceptible to proof of truth or falsity. The use of these terms in the present context is in short within the realm of protected opinion and idea under *Gertz.*

We come then to the charge, as Judge Griesa puts it, that appellant's book "accuses Buckley of deliberately acting as a deceiver in the purveying of fascist material." 394 F.Supp. at 939. Appellant's book did not make such a direct statement in any form, but again, this is the district court's interpretation of the implication of the passage in note 1, *supra.*[13] The book did state that National Review and Buckley's newspaper column frequently print "news items" and interpretations "picked up from the openly fascist journals," and that they have been important and useful agencies for "radical right" attacks on honest liber-

---

a looser usage "that [is] part of the conventional give-and-take in our economic and political controversies." *Cafeteria Employees Local 302 v. Angelos,* 320 U.S. 293, 295, 64 S.Ct. 126, 127, 88 L.Ed. 58 (1943), *quoted in National Association of Letter Carriers v. Austin,* 418 U.S. 264, 284, 94 S.Ct. 2770, 41 L.Ed.2d 745 (1974). Judge Griesa in other words treated the alleged libel as if Buckley had been called a fellow traveler of the Fascisti, or the Nazis, or the Falangists, or a mythical Fascist Party of America, quite another case than the one we have.

12. One of the most troubling aspects of the trial was that proof of "malice" was almost solely by way of examination of Littell by Buckley's counsel, an examination which covered over 500 pages of transcript.

13. Interestingly, paragraph 4 of Buckley's complaint purporting to define what was false and malicious about the passage, note 1, *supra,* made no claim of Buckley's being implicitly labeled a deliberate purveyor of fascist materials. Paragraph 4 reads as follows:

Said words were false and malicious. By said false and malicious words defendants intend to charge that plaintiff was a Nazi fellow traveler, that he admired Hitler, that he believed in the extermination of the Jewish people, that he favored the suppression of free speech, that he favored the exercise of brutality by police officers and other philosophies advocated by and associated with the Nazi party in Germany, that his own writings are false and malicious and have been exposed as such, and in particular, that his book "God and Man at Yale" has been exposed and condemned by professors, overseers and loyal alumni of that University for said falsity and malice, that said alleged falsity and malice extends to the fabrication of alleged quotations in publications other than "God and Man at Yale" and that said falsity and malice have been employed by plaintiff as regards at least several people and that said false and malicious assertions by plaintiff constantly undermine respect for the leadership and institutions of the United States and that plaintiff is a homosexual. Most of these allegations were properly dismissed by the district court.

als and conservatives. The judge evidently drew his interpretation from the prior definition of the fellow traveler functioning as a deceiver and Buckley's being said to be the outstanding representative of the "function"—whether the function of being a "fellow traveler" or a "deceiver" and whether a deliberate or unconscious deceiver being by no means clear, note 1, *supra*. It is one thing, however, to interpret the phrase about Buckley's representing a "function" as referring to the "fellow traveler" who "functions as a deceiver" in some way. But it is quite another thing to continue this interpolation into the later statement that Buckley prints items from "fascist journals" and to conclude that Buckley performs this act with the goal of deliberate deception. Upon this reasoning, every cited act of Buckley's could be read, despite lack of explicit connection, as an example of "deliberate deception," and such a reading is not only speculative, but is belied by the placement and grammar of the remarks in the passage.

The district court's interpolation of the libel of "deliberate deception in purveying fascist materials" is evidently the product of and dependent upon its construction of the earlier phrases "fellow traveler" and "functions as a deceiver," an interpretation we have analyzed and rejected as definitive in the context of this case, *see* text *supra* at n.8 & note 8. The district court noted Littell's denial on the stand of believing or meaning to say that Buckley was intentionally or deceptively purveying fascist material, and it is clear from its opinion that the source of the interpolation was not disbelief of Littell on this point. Indeed, the court called Littell's belief an "honest" one that there were instances when the National Review and Buckley's columns reflected information and points of view similar to those in some journals alleged by Littell to be "openly fascist." 394 F.Supp. at 939. Rather, the court's construction came solely, apparently, from its reading of Wild Tongues. *Id.* Given our earlier conclusion that the textual evidence supports a conclusion which is the opposite of the district court's as readily as it supports the district court's conclusion, *see* note 8 *supra*, we cannot say that the appellee proved with "convincing clarity," *New York Times Co. v. Sullivan, supra,* 376 U.S. at 285–86, 84 S.Ct. 710, that the second allegedly libelous statement in question was made in the form articulated by the district court, irrespective of its truth or falsity.

We find further that there was nothing libelous in the statement as it appears in Wild Tongues that the National Review and "On the Right" frequently "print 'news items' and interpretations picked up from the openly fascist journals." The issue of what constitutes an "openly fascist" journal is as much a matter of opinion or idea as is the question what constitutes "fascism" or the "radical right" in Wild Tongues. *See* note 5, *supra*. Buckley himself admitted that he or the National Review had occasionally printed items and interpretations picked up from openly fascist journals even as he defined them, although "for the purpose of denouncing them." Surely the difference of opinion between Buckley and Littell regarding what is "approval" of what one calls "fascist" and the other calls "radical right" or "denunciation" of the same highly debatable categories cannot give rise to recovery by the one against the other in this case.

We have a different factual context, however, concerned in the third alleged libel. For here appellant's book says, "Like Westbrook Pegler, who lied day after day in his column about Quentin Reynolds and goaded him into a lawsuit, Buckley could be taken to court by any one of several people who had enough money to hire competent legal counsel and nothing else to do." This is an assertion of fact, namely that Buckley had lied about and implicitly libeled several people who, if they wanted to and could afford it, could take him to court for his lies. As opposed to the loosely definable, variously interpretable statements of opinion above referred to made inextricably in the contest of political, social or philosophical debate, in this instance appellant's comment makes a factual

assertion relating to Buckley's journalistic integrity. *See* Restatement (Second) of Torts, *supra* § 566 & Comment. Even while *Gertz v. Robert Welch, Inc., supra*, in effect states that an expression of "pure opinion" may not be the basis of an action for defamation, it also said, 418 U.S. at 401, 94 S.Ct. at 3037, that "there is no constitutional value in false statements of fact." Regardless of what other implicit but unelaborated comparisons Littell was attempting to draw between Buckley and Pegler, and regardless of whether he was attempting to say that Buckley lied about individuals precisely in the way that Pegler did, *see* note 2, *supra*, it seems to us that this third remark as it appears on its face states that Buckley was engaging in libelous journalism. Given the proof of falsity which was presented and not successfully rebutted, it is constitutionally as well as tortiously defamatory.

While Littell suggested that he intended in the passage only to criticize Buckley's "goading, hounding and excessive pursuit" of many people, particularly of certain church men and church women Littell had in mind, as well as of Martin Luther King and Robert Kennedy, he also testified that he equated Buckley's frequent literary attacks as "falling within the general category of lying." Although he testified that he did not remember the specifics of the Pegler libels and did not mean to make a direct analogy between Pegler's libels and Buckley, what is critical is that Littell knew, as is evident from the passage itself, that Pegler's lies had been proved (by Reynolds) to be libels. Littell must have known that when he directly compared Buckley's statements with those of a proven libeler, the clear meaning to be inferred was that he considered Buckley to be a libeler like Pegler.

■ In response to Buckley's proof of the falsity of this accusation of libelous journalism, appellant's only rebutting proof of the truth of his charge was that Buckley had been sued in the past for libel; only one suit, however, had been successful, and that only by way of settlement.[14] As we read Judge Griesa's findings, he found that Littell's statement that Buckley engaged in libelous journalism was made with knowledge of its falsity or in reckless disregard of its truth or falsity, and this is a finding based in part upon credibility and demeanor which we cannot go behind. In this connection we emphasize that Littell's testimony clearly indicated that he could recall no instances of Buckley's lies about people as matters of fact, and that the lies he had in mind were not really "precise detailed lies" but rather lies on "a theoretical level" involving, as the record makes clear, Buckley's political opinions. Although he denied it, Littell also may have had in mind his own experience with Buckley and the latter's item, "Who Are the Totalitarians?", but that exchange hardly gave Littell license to attack Buckley's personal candor by the accusation of being a regular liar in print as to "several people." Furthermore, Littell's publisher was very much concerned about the paragraph in which the Pegler reference occurs, although not specifically about the sentence here found to be libelous; this concern should have been a red flag to Littell.

■ In short, whatever might be said of a person's political views, any journalist, commentator or analyst is entitled not to be lightly characterized as inaccurate and dishonest or libelous. We cannot disagree with the finding of the court below that it is "crucial" to such a person's career that he

14. An action by Dr. Linus Pauling for having been called a Communist fellow traveler by Buckley was dismissed for failure to prove knowing falsity or reckless disregard for the truth under *New York Times Co. v. Sullivan*, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964). *Pauling v. National Review, Inc.*, 49 Misc.2d 975, 269 N.Y.S.2d 11 (Sup.Ct.1966), *aff'd*, 27 App.Div.2d 903, 281 N.Y.S.2d 716 (1st Dep't 1967), *aff'd* 22 N.Y.2d 818, 292 N.Y.S.2d 913, 239 N.E.2d 654 (1968). *See also Buckley v. Vidal*, 327 F.Supp. 1051 (S.D.N.Y.1971). Buckley (or the National Review) did, however, pay the estate of a Mr. Harper about $13,000 in settlement of a libel action.

While appellant argues that he was referring to Buckley as a libeler in the loose, pre-*New York Times Co. v. Sullivan*, in other words the nonconstitutional, sense, we think this would be permitting him to have it both ways.

or she not be so treated. To call a journalist a libeler and to say that he is so in reference to a number of people is defamatory in the constitutional sense, even if said in the overall context of an attack otherwise directed at his political views.

 We pass then to the issue of damages. There was no proof of special damages—Buckley's reputation apparently suffered not at all from this book, which sold 941 hardcover and 8,226 softcover copies before it was voluntarily withdrawn from distribution when this action was begun. Thus he is entitled in any event to no more than one dollar in compensatory damages as found by the district court. The question is whether he is entitled to any punitive damages and, if so, how much. Appellant would have us take the view that punitive damages are subject to a different constitutional standard than compensatory damages, thereby abandoning our position in *Goldwater v. Ginzburg, supra,* 414 F.2d at 340–41. It may be that *Gertz v. Robert Welch, Inc., supra,* 418 U.S. at 350, 94 S.Ct. 2997, and its underlying concern lest punitive damages be used "selectively to punish expressions of unpopular views" especially with "the wholly unpredictable amounts" that can be awarded will ultimately lead the Supreme Court to hold that punitive damages cannot constitutionally be awarded to a public figure. But to date the Court has not so held, stating in *Gertz v. Robert Welch, Inc., supra,* only that punitive damages cannot constitutionally be awarded to a plaintiff who has met a standard of proof less demanding than "actual malice." We recognize that this is a somewhat higher standard of proof than that enunciated by Mr. Justice Harlan for the plurality in *Curtis Publishing Co. v. Butts, supra,* and it may be that *Gertz* rejects the assertion in *Butts* that "punitive damages serve a wholly legitimate purpose in the protection of individual reputation." 388 U.S. at 161, 87 S.Ct. at 1994. But absent clear word from the Court to the contrary, or an en banc, we are bound to abide by our own controlling decision in *Goldwater, supra,* and therefore must permit such an award in the appropriate case.

 We agree, however, with the appellant that the award is excessive, particularly in the light of our reversal of the judgment in its two more important aspects. It does not appear, moreover, that the trial judge investigated Littell's own financial situation, other than to note his occupation, to determine the extent to which the damages awarded would be an effective deterrent, but we gather from the record that Littell either could not afford or did not want a lawyer to defend him at trial and appeared pro se. He has been a man of the cloth and a professor of religion and hence subject to such a person's notoriously low salary. He received only $500 from the book. Buckley has recovered something, we know not what, from the publisher by way of settlement. Although ordinarily we would remand the issue of damages for consideration of the appropriate amount of reduction, in the interests of justice we will exercise our authority to reduce the award ourselves to the more reasonable figure of $1,000 punitive damages. *See* 6A J. Moore, Federal Practice ¶ 59.05[3] at 59–68 (2d ed. 1973); *see also Carroll v. United States,* 133 F.2d 690 (2d Cir. 1943); 1 F. Harper & F. James, The Law of Torts § 5.30, at 472–73 (1956); 11 C. Wright & A. Miller, Federal Practice and Procedure § 2820, at 127 & n. 75 (1973); *cf. Staplin v. Maritime Overseas Corp.,* 519 F.2d 969, 974 (2d Cir. 1975).

Judgment affirmed in part and reversed in part in accordance with this opinion.