**J. Gordon EDWARDS, Ph.D., et al., Plaintiffs,**

v.

**NATIONAL AUDUBON SOCIETY, INC., et al., Defendants.**

**No. 73 Civ. 1727 (CMM).**

United States District Court, S. D. New York.

Dec. 1, 1976.

Rothwell, Cappello & Berndtson, Washington, D. C., for plaintiffs; Thomas A. Rothwell, Arthur H. Berndtson, Washington, D. C., of counsel.

Cahill, Gordon & Reindel, New York City, for defendant The New York Times Co., Inc.; Floyd Abrams, Eugene R. Scheiman, Ruth D. MacNaughton, New York City, of counsel.

METZNER, District Judge.

Defendant The New York Times Company (the Times) moves for judgment notwithstanding the verdict rendered by the jury in favor of the plaintiffs in this action. Fed.R.Civ.P. Rule 50(b).

This is a libel action in which the jury awarded compensatory damages, but denied punitive damages, in favor of each of the plaintiffs against the Times and defendant Roland Clement, a vice president of the National Audubon Society, Inc. (the Society). The jury also rendered a verdict in favor of defendants Robert S. Arbib, Jr. and the Society.

The basis for the motion is that the standard of liability created in *New York Times Co. v. Sullivan*, 376 U.S. 254, 279–80, 84 S.Ct. 710, 726, 11 L.Ed.2d 686 (1964), has not been met by the evidence produced by these plaintiffs. That standard permits recovery only if the plaintiff proves "that the statement was made with 'actual malice'—that is, with knowledge that it was false or with reckless disregard of whether it was false or not."

The background of this lawsuit starts with the appearance of the Foreword to the April 1972 issue of "American Birds," a magazine published by the Society. Despite its date, the magazine was not distributed until the first week of July, 1972. Sometime around the end of July or the beginning of August, John Devlin, Sr., a reporter for the Times who has specialized in nature stories, read the issue and his attention was caught by statements made in the Foreword directed to the use of the Christmas bird count in connection with the DDT controversy that was raging in those days. The Foreword stated that it was "well-aware that segments of the pesticide industry and certain paid 'scientist-spokesmen' are citing Christmas Bird Count totals . . . as proving that the bird life in North America is thriving, and that many

species are actually increasing despite the widespread and condemned use of DDT and other nondegradable hydrocarbon pesticides." The Foreword went on to state that: "This, quite obviously, is false and misleading, a distortion of the facts for the most self-serving of reasons."

After stating what is supposed to be the truth regarding the bird count and its implications, this portion of the Foreword concludes:

"Any time you hear a 'scientist' say the opposite, you are in the presence of someone who is being paid to lie, or is parroting something he knows little about."

On August 14, 1972, a two-column story appeared in the Times under a Devlin byline. The headline over the story read, "Pesticide Spokesmen Accused of 'Lying' on Higher Bird Count." According to the article, the accuser was Arbib, the editor of "American Birds." The story goes on to state that while the Foreword did not identify the alleged spokesmen accused of lying, Arbib furnished the reporter with the names of five persons intended to be covered by the accusation, three of whom are plaintiffs in this case. The Times story gave the five names with identifying information as to each. The three plaintiffs in this lawsuit are Dr. Robert H. White-Stevens, a professor of biology and chairman of the Bureau of Conservation at Rutgers University, Dr. Thomas H. Jukes, a professor of biochemistry at the University of California at Berkeley, and Dr. J. Gordon Edwards, a professor of entomology at San Jose State College. The other two persons named in the story were Dr. Norman E. Borlaug, a Nobel Prize winner, and Dr. Donald A. Spencer, a retired ecologist and now a private consultant.

The Times story relates that not all those named could be reached for comment, but that those who were reached ridiculed the accusations as "emotional" and "hysterical," with Dr. Spencer being quoted as saying they were "almost libelous." The story concludes with quotations from the Foreword, including those referred to above, as well as paraphrasing of other portions.

■ The case was submitted to the jury without objection on the assumption that the plaintiffs were public figures. The story is clearly libelous. *Buckley v. Littell*, 539 F.2d 882 (2d Cir. 1976).

There is no doubt that the Times story accurately reported and correctly quoted from the Foreword in American Birds, although the headline was slightly off in accuracy. The jury found on credible evidence that the Times accurately reported the five names furnished by Arbib as being those referred to as liars in the Foreword.

The Times' position is that under these facts, the jury was not presented with clear and convincing proof that the article was published with actual malice and therefore could not have returned a verdict in favor of the plaintiffs. If this were all there is to the case, the court might be of a mind to grant defendant's motion. In fact, it might well have disposed of the litigation by granting the usual motion made at the end of the plaintiffs' case or at the end of the entire case. However, the events that transpired between the time Devlin read the Foreword and the publication of his story on August 14, 1972, require a denial of the motion.

■ In considering a motion for judgment notwithstanding the verdict, the court shall view the evidence in the light most favorable to the plaintiffs. *O'Connor v. Pennsylvania R. R.*, 308 F.2d 911, 914 (2d Cir. 1962).

■ We have here a reporter of 25 years' experience who must have known from the outset that he was dealing with a libelous article. The Times has never contended that the story was not libelous. The reporter attended annual meetings of the Society, went on field trips sponsored by the Society and had written several articles for the Society. He was not a novice as to the background of the story. Finally, his memory on the witness stand as to the events leading up to the publication of the story was abysmally poor and contradictory. He could not remember with any degree of accuracy to whom he spoke or the scope of the conversations.

The jury was fully justified in finding that while Arbib had furnished Devlin with the names, he had also cautioned against their use. This does not necessarily include a finding that Arbib had stated to Devlin that he was not calling the five persons liars. Devlin pressured Arbib for the names because he was of the opinion that this was newsworthy—the public ought to know which scientists were being called liars by the Society.

Devlin, with the names in hand, contacted Dr. White-Stevens on August 4 and read the Foreword to him. They had a 45-minute telephone conversation which covered the whole range of the agricultural chemical business. The testimony shows that this plaintiff was an outstanding scholar in the field of biology. Devlin was told that the statements were slanderous and scurrilous and should be checked carefully before being used. Dr. White-Stevens furnished Devlin with the telephone numbers of the other four named by Arbib although Devlin already knew that Dr. Borlaug was a Nobel Prize winner and associated with Rockefeller University, a most prestigious research institution here in New York City. This plaintiff also furnished Devlin with the telephone numbers of other eminent scientists in the field of pest control who should be contacted for their views on the subject. Devlin offered Dr. White-Stevens the opportunity to publish a story on the Op-Ed page of the Times, or even write an article for the Sunday Magazine section, but this offer was never followed up by Devlin.

Finally, Dr. White-Stevens recapitulated this conversation in a letter to Devlin on August 8 in which he furnished a list of materials for Devlin to read.

Devlin next called Dr. Jukes on August 7. The testimony of Dr. Jukes showed that he is an eminent scientist in the area of biochemistry and regarded as international authority on poultry nutrition. He organized the first chapter of the Sierra Club outside the state of California. Devlin told Dr. Jukes that he was working on an article predicated on information given to him by the Society to the effect that Dr. Jukes was a paid liar on behalf of the chemical industry. Dr. Jukes explained to Devlin his method of evaluating bird counts and referred to a letter written by the president of the Hawk Mountain Association. This plaintiff also told Devlin he was not a liar. The telephone conversation was followed up by Dr. Jukes in a letter sent to Devlin the same day.

Devlin also spoke on the telephone to Dr. Spencer who was not a party to this action, nor did he testify as a witness. However, Devlin's notes show that he wrote "WOW" next to the notation that Spencer called the statements in the Foreword libelous. Devlin testified on trial, "These are newsmaking names. The charges are very dramatic and newsy."

We thus have an initial publication which was not actionable in the absence of names. The reporter pushes for disclosure of the names so that he might write a story, in a newspaper with over 900,000 daily circulation, about individuals who have been called liars in one of the Society's publications. He knows from the inception that one of the scientists being called a liar is a Nobel Prize winner. He finds out as early as ten days before publication that at least two of the plaintiffs are not in the employ of the pesticide industry, nor are they being paid by such manufacturers to lie. He is given extensive background material on the views of these persons. He is furnished with names of other scientists with whom he might check out the story. He never made any effort to consult with counsel for the Times as to possible liability if the story was published. There is no evidence that any of his superiors made such inquiry.

Ten days were devoted to putting this story in shape with three different drafts of summaries sent by Devlin to his superiors for approval. Despite the warnings and the information furnished the reporter, the story appears in the newspaper as though it had been written the day after the Foreword first appeared in print and no investigation had ever been made. Dr. White-Stevens testified that after a week, he stopped reading the Times for any story as to the

Foreword. He assumed that Devlin had checked out what he had told Devlin and that Devlin was satisfied that the story was not warranted. Great was this plaintiff's surprise when a student brought the story to his attention. He read it and found that Devlin had ignored everything he told him in the lengthy telephone conversation and in his letter to Devlin.

It cannot be said that the Times knew that the statements in the story were false. However, the jury was justified in finding clear and convincing proof from the evidence and the inferences to be drawn therefrom that the story of August 14 was published with reckless disregard of whether it was false or not. This satisfies the test of malice as defined in the *Sullivan* case, *supra.*

This evidence also satisfied the test in *St. Amant v. Thompson,* 390 U.S. 727, 731, 88 S.Ct. 1323, 1325, 20 L.Ed.2d 262 (1968), to the effect that:

> "[R]eckless conduct is not measured by whether a reasonably prudent man would have published, or would have investigated before publishing. There must be sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication. Publishing with such doubts shows reckless disregard for truth or falsity and demonstrates actual malice."

I am aware of the words in the sentence following the above quotation, which state that such a test "permits the issue to be determined by the defendant's testimony that he published the statement in good faith and unaware of its probable falsity." I cannot take these words to mean that the reporter's testimony is not subject to impeachment by the accepted use of cross-examination and contradictory direct testimony, and the jury's province to determine whether evidence is credible or not, does not exist in this type of case.

Motion denied.

So ordered.